The Patapsco Insurance Company, Plaintiffs in Error *vs.* John Coulter, Defendant in Error.

Insurance on profits on board the ship Mary "at and from Philadelphia to Gibraltar and a port in the Mediterranean, not higher up than Marseilles, and from thence to Sonsonate in Guatemala, Pacific Ocean, with liberty of Guayaquil, the insurance to begin from the loading of the goods at Philadelphia, and to continue until the goods were safely landed at the said ports. The insurance, five thousand dollars, declared to be on profits, warranted to be American property, to be proved at Philadelphia only, valued at twenty thousand dollars." The vessel proceeded with a cargo of flour to Gibraltar, where the same was to be sold, and the proceeds invested at Marseilles in dry goods, to be sent from thence to Sonsonate or Guayaquil. While the vessel lay at Gibraltar, before the discharge of her cargo, she and her cargo were totally lost by fire. The evidence on the trial went to show, that with proper diligence on the part of the captain and crew, the fire might have been extinguished, and the vessel and cargo saved. Soon after the fire commenced, the captain called upon the crew to leave the ship, under an apprehension from a small quantity of gunpowder on board ; and after they left her she was boarded by other persons, who endeavoured without success to extinguish the flames, having, as was alleged, arrived too late. Evidence was given, intended to show that the fire originated from the carelessness of the captain. The circuit court refused to instruct the jury that if the fire proceeded from the carelessness or negligence of the captain, the insured could not recover. That court also refused to instruct the jury that if the fire originated from accident, or without any want of due care on the part of the master and crew, and if the jury should find that by reasonable and proper exertions the vessel and cargo might have been preserved by them, which they omitted, the assured could not recover. That court also refused to instruct the jury that the assured, having offered no evidence that the sales of the flour at Gibraltar would have yielded a profit, they were not entitled to recover. Held, that there was no error in these instructions.

What is barratry. Its definition. [230]

The British courts have adopted the safe and legal rule, in deciding that where the policy covers the risk of barratry, and fire is the proximate cause of the loss, they will not sustain the defence that negligence was the remote cause, and hold the assurers liable for the loss. [236]

The rule that a loss, the proximate cause of which is a peril insured against, is a loss within the policy, although the remote cause may be negligence of the master or mariners, has been affirmed in several successive cases in the English courts. [237]

It seems difficult to perceive, if profit be a mere excrescence of the principal, as some judges have said, or identified with it, as has been said by others, why the loss of the cargo should not carry with it the loss of the profits. Proof that profits would have arisen on the voyage, in order to recover on a policy on profits, is not required if the cargo has been lost. [241]

ERROR to the circuit court of the district of Maryland.

This action was instituted in the circuit court on a policy of insurance, executed by the plaintiffs in error, on profits upon goods on board the ship Nancy, " at and from Philadelphia to Gibraltar and a port in the Mediterranean, not higher up than Marseilles, and at and from thence to Sonsonate, in the province of Guatemala, Pacific ocean, with the liberty of Guayaquil : beginning the adventure upon the said goods, from the loading thereof on board the said vessel at Philadelphia, and continuing the same until the said goods shall be safely landed at the ports aforesaid."

The insurance was in the amount of five thousand dollars, with this clause : " this insurance is declared to be on profits, warranted to be American property, to be proved at Philadelphia only, valued at twenty thousand dollars."

The vessel, with a cargo of flour, proceeded from Philadelphia to Gibraltar, at which place the cargo was destined to be sold, and the proceeds to be invested at Marseilles in the purchase of various specified dry goods. These dry goods were to be sent by the vessel from Marseilles to Sonsonate or Guayaquil. While the vessel lay at Gibraltar, before the discharge of her cargo, she and her cargo were totally lost by fire. Evidence was taken at Philadelphia, as to the circumstances of the destruction of the property, and one witness (Mr Fulford) was examined in addition as to those circumstances at the trial. The testimony of this witness went to show that with proper diligence on the part of the captain and crew, the fire might have been extinguished and the vessel and cargo saved ; and the evidence obtained at Philadelphia was not inconsistent with that conclusion. It appeared from Mr Fulford's testimony, that, soon after the fire commenced, the captain called upon the crew to leave the ship, exclaiming that there was gunpowder aboard, and that the vessel would be blown up; and the captain and crew did then leave the vessel. It was in evidence that there was a small quantity of gunpowder on board, but that that ought not to have deterred exertions to save the property; an officer and a number of men from two British frigates hav-

ing in fact, a considerable time after the vessel was deserted by her captain and crew, boarded her and used all efforts to put out the flames, but unsuccessfully, in consequence of their reaching the scene so late. There was evidence to infer that the fire originated from the carelessness of the captain with a candle used by him for sealing letters, or from negligence of the crew.

Evidence was had at Philadelphia, of Mr Clark, concerning the markets at Sonsonate and Guayaquil, for the specified articles at Marseilles. His testimony tended to show that these articles would have been sold with profit at Guayaquil, at the time the vessel might have reached there. It was proved, that at Gibraltar the flour would have sold without loss, but *without profit*.

The defendants prayed the court to direct the jury,

1. That if they should believe from the evidence, that the fire, which occasioned the destruction of the ship and her cargo, proceeded from the carelessness or negligence of the captain of the ship, or any of her crew, the plaintiff was not entitled to recover.

2. That if they should believe that the fire which occasioned the ship's destruction originated from accident, and without any want of due care and attention on the part of the captain or crew, and if they should further find that the captain and crew, after the discovery of the fire, might, by reasonable and proper exertions, have prevented the spreading of the same, and have preserved the said vessel and cargo from destruction; and that they omitted to use said exertions, then the plaintiff was not entitled to recover.

3. That the plaintiffs had offered no evidence that the sales of the flour at Gibraltar would have yielded the plaintiff a profit, and that therefore they were not entitled to recover.

These prayers the court refused; but as to the second of them directed the jury as follows: " that the plaintiff is entitled to recover, unless they should be of opinion, from the evidence in the cause, that after the vessel was discovered to be on fire, the master and crew might have extinguished

the same, and preserved the vessel and cargo. The master was bound to extinguish the fire, if practicable. If he stood aloof, without making any exertion to extinguish the fire, and suffered the vessel to be destroyed, it would have afforded evidence of such gross negligence as to amount to barratry."

To the refusal of the prayers, and opinion and direction of the court, the defendants, now plaintiffs in error, excepted.

Mr Mayer, for the plaintiffs in error, contended.

1. That they are not answerable, under the policy, for any loss by fire, if occasioned by the negligence of the captain and crew of the Nancy; that the risk of fire bears on the insurers as other risks in the policy; that the assured being bound to the exercise of reasonable skill and care in his agents to guard the property insured against the perils stated in the policy, under the implied warranty of seaworthiness, the underwriters ought not to suffer loss from a fire which the captain or crew might with ordinary care have prevented taking place.

2. That if it was the duty of the captain and crew to prevent the fire, it was equally their duty to extinguish it; and the consequences of their negligence in this particular ought not to fall upon the insurers; and that even the *gross* negligence of the captain and crew, in regard to a duty of this kind, is a mere *nonfeazance*, and is not to be considered *barratry;* that the remissness of the captain, in this case particularly, is not so to be considered, because, however weak his conduct may have been, he was acted upon by inordinate fears only, and by no motives of interest or any views of unauthorised discretion or wilful delinquency.

3. That the profits here insured were incident to the cargo shipped at Philadelphia, and not to any property that might be substituted for it, though acquired with the proceeds of the original cargo; that the contemplated adventure from Marseilles to Guatimala was therefore foreign to the insurance. That even in a valued policy on profits, evidence must be given of some profit likely to result, and that

VOL. III.—2 D

without such evidence the insurance has no subject to ope-
rate upon ; that the flour being destined to be sold at Gib-
raltar, and not affording there a profit, as was proved, there
is in effect no insurable interest whatsoever shown in the
defendant Coulter ; and that he cannot, therefore, recover
under a valued policy on profits.

Underwriters are not liable for any loss arising from
gross negligence or want of skill of the captain and crew.
The object of insurance is to guard against extraordinary
perils. They necessarily beset every mercantile adventurer,
and there must be skill and diligence to meet them. It is
a part of the business of the voyage that those who are on
board of the vessel shall be on the alert, and if they are not,
the underwriters are exonerated. Marsh. on Ins. 156, 487,
690. 5 Mass. 1. 8 Mass. 321, 436. 13 Johns. 180, 187.
Phillips on Ins. 225. If the first cause of the accident
which produces the destruction of the vessel was not within
the policy, its consequences do not attach to the policy.
There is nothing in the terms of the policy against fire which
exempts them from the operation of these principles.

If the captain and crew omitted reasonable exertions to
extinguish a fire which had occurred from accident, the in-
surers are not liable ; gross negligence in both is not barra-
try ; and if they stood aloof without making proper and suf-
ficient efforts to prevent the ravages of the fire, the court
should have left these facts to the jury, from which they could
have inferred for the assurers. Abbot on Ship. 128, note.
8 Cranch, 49. 5 Mass. 1. 8 Mass. 531. Marsh. on Ins. 515.
Phill. on Ins. 230. 8 East, 133.

The cargo would have produced no profit, and the plain-
tiff offered no proof that profits would have been obtained
on the cargo sent from Philadelphia ; and the insurance at-
tached only to the cargo shipped there. Some profits must
be proved before the underwriters are answerable, as this
cannot be left to inference. 6 East, 315. 12 East, 124.
16 East, 218. The policy is a contract of indemnity for
actual injury or loss ; and the principles of the law of insur-
ance are against wagering policies. 2 Mass. 1. 12 Wheat.
288. Phill. 69. It is admitted that a party may cover a

[The Patapsco Insurance Company *vs.* Coulter.]

series of adventures, and expected profits on them; but if he has omitted to do this in explicit terms, he must sustain the loss himself. The terms of this policy are not broad enough to cover all the profits anticipated, and which are claimed from the underwriters, the plaintiffs in error. Marsh. on Ins. 323. Phill. 166. 2 Mass. 409. 4 Camp. 294. 12 East, 283. 1 Taunt. 463. 12 Wheat. 283. 6 Mass. 197. 2 Mass. 420.

Mr Wirt, for the defendant in error, argued, that the facts of the case made out a loss by accident or misfortune, and of innocence on the part of the master; and that from the situation of the vessel, part of the crew being absent, and the fact of there being powder under the cabin floor when the fire broke out, no other efforts than those which were made to save her would have been prudent or proper; all the skill that could be expected was employed. According to the established principles of the law of insurance, there must be ignorance so gross as to amount to unseaworthiness to excuse the insurer, but not otherwise.

It would be the introduction of a new principle in the law of insurance, if the want of more than common care and usual skill would discharge the underwriters. Every loss would be traced to such a proximate cause. A ship is left in a storm; would proof that setting another sail would have placed her beyond the peril excuse the underwriters? The seaman at the mast head, whose duty it is to look out for land, as a coast is approached falls asleep, and the vessel is lost; this, under the principle claimed, would release the assurers. The underwriters will undertake to inquire whether the captain and crew should have resisted longer, before they submitted in battle. Human infirmities are at the risk of the insurers, as well as the perils of navigation.

The cases decided in England repudiate the doctrine asserted by the plaintiff in error, and for the reasons and on the principles now submitted to the court. 2 Barn. & Ald. 72. 5 Barn. & Ald. 171. 7 Barn. & Cress. 217. 14 Com. Law Rep. 33. 7 Barn. & Cress. 794. 14 Com. Law Rep. 129.

Gross negligence is, upon adjudged cases, barratry; and thus, if such should have occurred in this case, the underwriters would be liable: 2 Camp. 149. 8 East, 126. 11 Petersdorf, 268. 2 Phill. on Ins. 237. 2 Camp. 620. 1 Taunt. 227. 2 New Rep. 336. 4 Taunt. 226. Peake, 212. 1 Camp. 123.

The policy attached to the whole voyage, and was intended to cover the profits upon it. The interruption or breaking up of the voyage, preventing the earning of those profits; and in whatever part of it the occurrence took place, entitled the assured to recover the amount of the policy. An insurance on profits has been settled to be legal and proper. In the American courts it is not necessary to prove what the profits would have been, but in England the rule is otherwise.

Courts construe the policy liberally, to include all the objects and intentions of the parties, according to the nature of the voyage. In this case, the subject of insurance was the profits on the whole voyage, and the cargo which was taken on board at Philadelphia was to furnish the means of proceeding with the adventure. By its loss, the whole of the profits were lost. Catlett *vs.* The Columbian Insurance Company, 12 Wheat. 383. Phill. on Ins. 319, 29, 70, 46. 47.

Mr Justice JOHNSON delivered the opinion of the Court:

This was a case of insurance on profits on a voyage from Philadelphia to Gibraltar, and a port in the Mediterranean not higher up than Marseilles, and at and from thence to Sonsonate, in the province of Guatemala, Pacific Ocean, with the liberty of Guayaquil. The risks are those usually inserted in policies, including fire, and barratry. The loss alleged is from fire alone.

The vessel reached Gibraltar in safety, and while lying there, took fire and was entirely consumed, together with her cargo.

The evidence on the part of defendants below went, first, to charge the master with having caused the fire by his own carelessness; secondly, with having desisted, and restrained the crew and others from efforts which might have extinguished the fire, under apprehensions not very well founded,

that it would communicate with powder, laden near to where the fire originated. It was also objected to the plaintiff's right of recovery, that he had given no kind of evidence of profits, or probable profits, from a sale at Gibraltar,

This difference furnishes the subject of three bills of exception. The first of which went to the refusal of the court to instruct the jury, that if they believed the fire proceeded from the negligence or carelessness of the captain, the plaintiff below was not entitled to recover.

The second, that if they believed the fire originated in accident, without any want of due care and attention in the captain and crew, yet, if after it had commenced, the captain and crew might with ordinary care and exertion have extinguished it, the plaintiff below was not entitled to recover.

The first of these instructions was refused expressly. The second was refused as prayed; and in its stead the court instructed the jury, that the plaintiff was entitled to recover, unless they should be of opinion from the evidence, that after the vessel was discovered to be on fire, the master and crew might have extinguished it, and preserved the vessel and cargo. That the master was bound to extinguish the fire, if practicable; and if he stood aloof without making any exertion to extinguish it, and suffered the vessel to be destroyed, it would have afforded evidence of such gross negligence as would amount to barratry.

As the plaintiff below is in possession of the verdict, it is immaterial to him if this charge was more favourable to his adversary than the law admits. We have only to do with so much of the case presented by these bills of exception, as makes against the interest of the insurers.

And as to the refusal to instruct the jury that "their verdict must be for the insurers, if they believe the loss to have proceeded from the carelessness or negligence of the captain," it is obvious, since barratry is insured against, that the court must not be held to have affirmed that fire proceeding from negligence was a loss within the policy, independently of the risk of barratry, but that negligence was no defence where barratry was insured against.

It cannot be denied, that what with adjudged cases and elementary opinions, this doctrine has got into a great deal of confusion. Many attempts have been made to define the term barratry, in its marine sense; but when compared with the ideas attached to the word, as derived from the most respectable sources, such definitions will too generally be found deficient in precision or comprehensiveness; they need commentaries to apply or explain them. And it is remarkable, that the point in which all the definitions in the English or American authorities agree; to wit, that fraud must be a constituent of the act of barratry; is that in which practically all the difficulties arise. The question seems to be between " dolus" and " culpa," which of those two words best conveys the sense of the law.

It cannot be denied that the etymology of the word favours the adoption of the former. The term barratry is known to the common law; and Cowel's Interpreter refers its origin to a Latin word, which would attach to it the idea of meanness, selfishness, and knavery. Some of our English books, following a French writer, (Pasquier sur Emerigon,) derive it from " barat," an old French or Italian word, which they explain by " tromperie, fourbe, mensonge."

I should myself derive the word from the Spanish *barateria, baratero*, which are rendered *fraus*, and *fraudulentus*. But it is worthy of particular notice, that writers on maritime law of the first respectability (I think Emerigon, gives six in number) in explaining the marine sense of the word barratry, use the French word " prevariquez," which can only be translated into " acting without due fidelity to their owners." The best French dictionary we have renders it by " agir contre les devoirs de son charge," acting contrary to the duties of his undertaking, and " trahir la cause ou l'interet des personnes qu'on est obligé de defendre," to betray the cause or interest of those whom we are bound to protect.

Nor will it be found that the idea of the British courts of the meaning of fraud as applied to barratry varies perceptibly from this exposition. In the case of Moss *vs.* Byron, 6 T. R. 379, we find the very words adopted by one of the judges;

"if the captain acted contrary to his duty to his owners," it was barratry; and " if he did any act to increase the risk," it was barratry. And in the case of Burk *vs.* The Royal Exchange Insurance Company, the court lay it down as the law, that the term barratry is used in the policies as applicable to the " wilful misconduct" of the master and mariners. And even in the case of Phyn *vs.* The Royal Insurance Company, in which Laurence, Justice, wishes to resume or explain his definition, in Moss *vs.* Byron, he concludes with adopting the definition of Lee, C. J. in Stemmer *vs.* Brown, in which he says, " barratry must be some breach of trust in the master *ex maleficio*," in which, I presume, maleficium must mean some wilful and injurious act. And as this case is given by the latest English compiler (11 Petersdorf, 269, Case 6) as the authority for the unqualified doctrine " that there must be fraud to constitute barratry, and the definition of C. J. Lee, just quoted, is given in his margin, as comprising the substance of this case, we are furnished with an apt opportunity of ascertaining the idea attached in Great Britain to both the terms " fraud" and maleficium, by referring to the case itself.

The defence of the underwriters there turned upon a deviation, and the question was whether it was a fraudulent deviation. If a general deviation, the underwriters were discharged; but if a fraudulent deviation, then it was barratry and a risk in the policy. The whole evidence in the cause in which the question of fraud was raised, was this : the vessel was bound from London to Jamaica, but was driven by currents out of her course. Upon recovering her reckoning, she was found to be between the Grand Canaries and the Island of Teneriffe. In this situation it was admitted that her course was south west, instead of which the captain bore up for the island of Santa Cruz, which lay north west, and in sight about thirty miles off, and came to anchor ; for the purpose, as is supposed in the argument, to get refreshments, or in some way for his own accommodation. The jury found it to be a simple deviation without fraud, and the court only decide that they cannot adjudge it a fraudulent deviation in opposition to the finding of the jury. But it is

no where hinted that the jury might not have found it otherwise, and their verdict have been sustained upon the evidence in that cause.

On the contrary, so far as fraud or maleficium may be supposed to imply a dishonest or injurious intention towards the owner, the idea is negatived by a variety of cases. In that of Earle *vs.* Rowcroft, 8 East, 126, it was admitted that the captain unaffectedly acted with a view to promote the owners' interest, and would materially have promoted their interest had he escaped detection. But he had deviated from his instructions, and increased the risk by trading with an enemy; and it was held to be barratry. The court there say, it has been asked how is this act of the captain in going into d'Elmina, in order to purchase the cargo for his owners more cheaply and expeditiously, *a breach of trust* as between him and them? Now I conceive that the trust reposed in a captain of a vessel obliges him to obey the written instructions of his owners, where they give any; and where the instructions are silent, he is at all events to do nothing but what is consonant to the laws of the land, whether with or without a view to their advantage.

Here we see that an act "inconsistent with written instructions," and an act "not consonant to the laws of the land," are brought within the description of fraud upon the owners, as applied to the definition of barratry. From which it would seem to result, that it is not confined to moral fraud; or that the term is not well chosen; or that practically, in its application to this subject, *culpa* would better express the idea than dolus.

The commercial regulations of maritime nations, both of ancient and modern times, are very various on the subject of the liability of assurers for the acts of the master; and it is not without much appearance of reason that Emerigon observes, that the French ordinance has put it upon the just medium.

The regulations on this subject are contained in the twenty-sixth, twenty-seventh and twenty-eighth articles of the fifth title.

By the twenty-sixth article, " all losses and damages hap-

pening at sea, by tempest, shipwreck, running aground or aboard of other ships, changing the course of the voyage or of the ship, ejection, fire, taking, rifling, detention by princes, declaration of war, reprisals, and generally by all maritime accidents, shall be at the risk of the insurers. By the twenty-seventh, however, if the changing of the course, voyage, or ship happens by the order of the insured, without the consent of the insurers, they shall be discharged from the risk; which shall likewise take place in all other losses and damages happening by the fault of the insured; nor shall the insurers be obliged to restore the premium, if the time of their bearing the risk be begun. Nor shall the insurers be obliged to bear the losses and damages happening to ships and goods by the *fault* of the master and mariners, except that by the policy they be engaged for the barratry of the master.

It is this last rule to which the observation of Emerigon is particularly directed; and although the British decisions do not adopt the negative language of the regulation without limitation, they certainly come up to the positive rule which it implies, whenever the case of the master is considered *a fault with reference to his duty to his owner.*

It has been remarked by a British court, (Busk *vs.* The Royal Ex. Ass. Company, 2 Barn. & Ald. 82,) that in France, negligence, as well as wilful misconduct, is considered barratry; and they give the authority of the commentator on the ordinance of Louis the Fourteenth, Valin, for the assertion. But as the author is commenting upon the twenty-eighth article, I am inclined to consider the passage as only intimating that negligence is a fault within the words of the ordinance.

And the same court, in the same cause, have certainly affirmed the same principle, in its positive sense; that is, that where an insurance is against barratry, a loss arising from fire originating in negligence shall be borne by the underwriters.

It would be a great relief to this court, if there existed such an uniformity in the decisions upon this subject, as to place our decision upon adjudged cases. But it is not to be questioned, that the English and American decisions are in

direct hostility with each other, as to a loss by fire arising from negligence, where there is an insurance against barratry.

It must be repeated, that the general question where there is no insurance against barratry need not here be considered. The judge was not bound to give an instruction abstracted from the case. And the question, whether, where the breach laid was loss by fire only, the plaintiff could maintain his action by giving in evidence a barratrous burning, did not properly occur. The point when properly stated stands thus: the plaintiff lays the breach by fire, and the defendant, to repel his liability, insists that the fire was produced by negligence of the master; the plaintiff replies that negligence is no defence where the barratry is insured against; the court maintains the doctrine of the plaintiff, and adds, that negligence itself, when gross, is evidence of barratry. And certainly a master of a vessel who sees another engaged in the act of scuttling or firing his ship, and will not rise from his birth to prevent it, is prima facie chargeable with barratry. Although a mere misfeasance, it is a breach of trust, a fault, an act of infidelity to his owners. So if, in the height of a storm, the captain and crew turn in without resorting to the nautical precautions of laying the vessel to and otherwise preparing her to overcome the peril, it may well be left to a jury to determine if such conduct be not barratrous.

The truth is, that in the incidents to this kind of contract, misfeasance and nonfeasance often approach so near to each other in character and consequences, that it is not surprising if courts of justice should incline to the adoption of rules which would relieve them from the difficulty of discriminating, or the inconsistencies that might result from their efforts to discriminate.

The case of Green *vs*. The Phœnix Insurance Company, decided in New York, was certainly a very strong case to establish the doctrine that a loss by fire, proceeding from negligence of the master and mariners, was not a loss within the policy, although barratry be one of the risks. It will, however, be found, by looking into the reasons which govern-

ed the court in that case, that its conclusions were drawn partly from the too general expressions of an elementary writer, and partly from analogy with other decisions in which the expressions of the court, unless restricted to the cases before them, were justly deemed authority for the decision there rendered. The question was one of the first impression, and one on which the best constituted minds may well have been led to contrary conclusions. It was however no unreasonable claim upon the profession made by Lawrence, Justice, in the case of Phyn *vs*. The Royal Ex. Ass. Company, with regard to his own doctrines in Moss *vs*. Byron, "that what fell from him there must be taken in reference to the case then in judgment before the court." Thus restricted doctrines will often be found correct, which in a more general sense might well be questioned. And in the case of Voss and Graves *vs*. The Un. Ins. Company, and also in that of Cleveland *vs*. The same Company, relied upon in the New York decision, the act of the master, for which the underwriters were held to be discharged, was in the first instance sailing towards a blockaded port with intent to violate the blockade, and in the second, leaving his register behind him. The first of these cases did not call for the opinion of Kent, Justice, on the subject of negligence; the second is exactly one of those cases in which a nonfeasance becomes a misfeasance, and both relate to the discharge of a duty unquestionably belonging to the insured, and the master as his agent. Attempting a breach of blockade was an unwarrantable increase of risk, which might or might not be barratrous according to circumstances. And for a vessel to leave her register behind in time of war, affected her seaworthiness as much as leaving her compass or quadrant or anchors at home at any time. So neglecting to take a pilot, neglecting to pay port duties, neglecting to obtain a clearance, neglecting to comply with the laws of any port which the vessel has leave to enter; all these, although nonfeasances, involve misfeasances, which discharge the underwriters, because they violate implied duties incident to navigating the vessel, and produce a positive and definite increase of risk.

It was not until the year 1818, that the question was set-

tled in the British courts, on the liability of the underwriters for a loss like the present. In the case of Busk *vs.* The Royal Exchange Assurance Company, the question is finally and fully decided there, in direct hostility with the decision in New York; and this court is now for the first time called upon to establish a rule for its own government in similar cases.

Losses by fire must happen either from the act of God, from design, or from accident. If from design, and by the captain and crew, it is barratry; if by any other person, or by pure accident, it is clearly a risk by fire, but from the peculiar character of this risk, it is no easy matter to point out an accident that may not be resolved into negligence. If by the falling of a candle, it may have been because due care was not bestowed upon securing it; and if from a spark from the cambouse, it may have been from neglect in not closing or constructing it; and if from a flue or a stove, the same reasor may be assigned. It has already been shown, that gross negligence may be evidence of barratry, and when it is considered how difficult it is to decide where gross negligence ends, and ordinary negligence begins, and to distinguish between pure accident and accident from negligence, we cannot but think that the British courts have adopted the safe and legal rule, in deciding, that where the policy covers the risk of barratry, and fire be the proximate cause, they will not sustain the defence, that negligence was the remote cause.

We think this rule also the most consistent with analogy and mercantile understanding. It is very justly observed in the case of Busk *vs.* The Royal Exchange Assurance Company, that it is a strong argument against the objection there raised for the first time, that in the great variety of cases that have occurred upon marine policies, no such point had ever been made. And I will add, it is not improbable from comparison of dates, that the defence maintained in the New York decision, suggested that made in the British courts.

The long acquiescence may have had its origin in a general mercantile understanding, or perhaps in the doctrine of Malynes, whose book unites the recommendations of antiquity, good sense, and practical knowledge. The passage

[The Patapsco Insurance Company *vs.* Coulter.]

has been misquoted as to its place: it is found in page 155, in these words : "'barratrie of the master and mariners can hardly be avoided, but by a provident care to know them, or at least the master of the ship upon which the assurance is made. And if he be a careful man, the danger of fire above mentioned will be the less for the ship; boys must be looked unto every night and day. And in this case let us also consider the assurers; for it has oftentimes happened, that by a candle unadvisedly used by the boys, or otherwise, before the ships were unladen, they have been set on fire and burnt to the very keel, with all the goods in them, and the assurers have paid the sums of money by them assured. Nevertheless, herein the assurers might have been wronged, although they bear the adventure until the goods be landed; for it cometh to pass sometimes, that whole ships' ladings are sold on ship board, and never discharged," &c. In the residue of this passage the author certainly intimates that the wrong done to the assurers is in being made to pay after the transfer of the interest to a third person, and the initiation of a new voyage. And the general doctrines involved in this case are certainly sustained by analogy to other cases. It seems generally conceded, that in the case of insurance against fire on land, negligence of servants or of the tenant is no defence, nor of the proprietor, unless of such a character as to sustain the imputation of fraud or design. And the rule that a loss, the proximate cause of which is a peril insured against, is a loss within the policy, although the remote cause may be negligence of the master or mariners, has been affirmed in several successive cases in the English courts. The case of Watkins *vs.* Maitland, cited in argument, is a very strong case of this description. And both in that and the case of Bishop *vs.* Pentland, decided as late as 1827, the decision in Busk *vs.* The Royal Exchange Assurance Company is expressly quoted by the court, and affirmed as law. So that the doubt expressed by Mr Phillips upon the authority of that case does not seem well founded. Phillips on Insurance, 249.

It is true that in the application of the principles to particular cases, courts of justice will sometimes find themselves

embarrassed in discriminating between that *crassa negli-gentia* which will discharge the underwriters by varying or increasing the risk, and that upon which they may be made liable on the ground of barratry ; but the difficulty is only one which those engaged in the administration of justice have often to feel and lament—to wit, the difficulty of fathoming men's motives ; and in this the court can only rely on the judgment and experience of juries. While the captain is not regardless of his duty to his owner, his actions cannot be barratrous ; but if no act of infidelity to the owner be imputable to him from the evidence, then it is affirmed in various cases that a material increase of the risk from gross negligence may discharge the underwriters. Such was admitted to be the law in Toulmin *vs.* Anderson, 1. Taunt. 227, and Toulmin *vs.* Inglis, 1 Camp. The case of Pipon *vs.* Cope, 1 Camp. 434, was decided on this distinction, and the defence set up in Heyman *vs.* Parish, 2 Camp. 149, went upon the same ground. It is true these are nisi prius cases, but they serve to illustrate the doctrine and course of decision.

In the case of Arcangelo *vs.* Thompson, 2 Camp. 620, it was ruled, that where the loss was laid by capture, it was no defence for the underwriters, to prove that the capture was barratrous ; and it would indeed be singular, if where one breach is laid and proved, the party defendant could avail himself of another breach for which he was equally liable on the same contract.

The third prayer for instruction is in these words: "that the plaintiffs had offered no evidence that the sales of the flour at Gibraltar would have yielded the plaintiffs a profit, and that therefore they were not entitled to recover." This was refused, and the question is, whether the defendants were entitled to it, as prayed.

This instruction presents two propositions : 1. That it was necessary to prove loss of profits, otherwise than by the loss of the cargo. 2. That the plaintiff was limited to proof of profits on a sale at Gibraltar. With regard to the second it is clear that the instruction was properly refused, for there was nothing in the policy to prevent the assured from proceeding with the original cargo to the Pacific, although the

course of trade would have sanctioned him in selling and replacing it.   But the first proposition is one of more difficulty.

Courts of justice have got over their difficulties on the question whether profits are an insurable interest, but how and where that interest must be established by proof, in case of loss, is not well settled.   Here again there appears to be a conflict between the British and American decisions.

The earliest of the British decisions, that of Barclay *vs.* Cousins, 2 East, 544, certainly supports the doctrine that the profits sink with the cargo, or at least that the loss of one is prima facie evidence of the loss of the other, and throws the onus probandi upon the defendant.   Such is the intimation of the court, p. 551, and the recovery was had in that case without proof that profit would have been made had the cargo arrived at the destined port.   In the case of Henrickson *vs.* Margetson, 2 East, 549, of which a note is given in that case, the recovery was also had without proof that the profits would have been made, or any other proof than an interest in and loss of the cargo; and lord Mansfield seems to have suggested the true ground for dispensing with such proof: to wit, the utter impracticability of making it, without the spirit of prophecy to determine the precise time when the vessel would arrive at her destined port.

The two subsequent cases which are cited in the elementary books to sustain the contrary doctrine, are not full to the point.   In that of Hodgson *vs.* Glover, 6 East, 316, there was another question of as great difficulty : to wit, whether in a clear case of average loss, the plaintiff could recover as for a total loss, or recover any thing without evidence to determine the average.   Of the four judges who sat, two decided against the plaintiff, upon the one ground, and two upon the other.

In the second case, that of Eyre *vs.* Glover, 16 East, 218, although the point was touched upon in argument, yet the court neither expressly affirm nor deny it; it was not the leading question in the cause; and at last, judgment is rendered for plaintiff without requiring such proof.   But the case of Mumford *vs.* Hallet, 1 Johns. 439, goes further.   It

as a case of insurance on profits, in which there was no evidence given that profits would have been made upon a arrival, nor was any other loss proved than an incident to the loss of the goods. On that state of facts, Livingston, justice, who delivers the opinion of the court, remarks, "it does not follow that a profit will be made if the cargo arrived, yet its loss would give a right to recover on such a policy." There are other questions in the case; but, after all were settled, this principle was essential to the plaintiff's right to recover.

In the case of Fosdick *vs.* The Norwich Insurance Company, decided in the supreme court of errors of Connecticut, the question was moved in argument, that to justify a recovery the plaintiff must show that profits would have accrued upon safe arrival of the goods; but the language of the court, in expressing their decision, is not so explicit as to enable us to determine whether it was intended to apply as well to the proof of loss as to the insurable interest. Yet the right of the plaintiff to recover being affirmed in that case without other proof than the loss of the goods, it would seem to be an authority for the doctrine that no other was necessary.

The report furnishes no other proof of loss of profits than what was implied in the loss of the cargo in which the insured had an interest. And on the question of insurable interest, which was the main question in the cause; the chief justice asks, "if profits are any thing more than an excrescence upon the value of goods beyond the prime cost."

As to the American cases, Mr Phillips quotes that of Loomis *vs.* Shaw, (if I understand his language as he meant to use it,) as going farther than the case warrants; 2 Johns. Ca. 36. The court waives the question now under consideration, by suggesting that the defendant had waived it by an act of his own.

In the case of Abbot *vs.* Sebor, 3 Johns. Ca. 39, which was a motion for a new trial, the decision turned chiefly on the question, whether the court had misdirected the jury in instructing them, that the plaintiff must recover the whole sum insured on profits, or nothing. That is, that he could

not recover for an average loss. The question, if proof that profits would have been made had the vessel arrived in safety was necessary to his recovering, was not touched. Yet the right to recover is affirmed in that case, and it does not appear that any proof to that effect had been offered or required, beyond the loss of the goods on which the profit was expected. But the authority amounts to no more than an implication.

We must now dispose of the question upon reason and principle; and here it seems difficult to perceive why, if profit be a mere excrescence of the principal, as some judges have said; or an incident to or identified with it, as others have said; why the loss of the cargo should not carry with it the loss of the profits. This rule has convenience and certainty to recommend it; of which this case presents a striking illustration. Here was a voyage of many thousand miles to be performed, the final profits of which must have been determined by a statement of accounts passing through several changes, some of which might have resulted in loss, some in gain; and in each case the good or ill fortune of the adventure turning on the gain or loss of a day in the voyage. What human calculation or human imagination could have furnished testimony on a fact so speculative and fortuitous? To have required testimony to it, would have been subjecting the rights of the plaintiff to mere mockery.

On this point we must support the American decisions.

Justices THOMPSON and BALDWIN, dissenting.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be and the same is hereby affirmed with costs and damages, at the rate of six per centum per annum.