## McDowell and Peck *v.* General Mutual Insurance Co.

A master, in entering a foreign port where pilots are usually employed, is bound to approach the pilot ground with caution, and to use reasonable diligence to obtain one. If he enters without a pilot, and the vessel grounds and is wrecked in doing so, the underwriters on ship are not answerable for the loss thereby sustained, unless it be shown that reasonable diligence to obtain a pilot was unsuccessfully exerted, or that circumstances of impending danger rendered it unsafe to wait for a pilot, or that such other state of facts existed as would reasonably excuse the omission, by showing its necessity.

The subject of employing a pilot falls under the head of seaworthiness; and that warranty is equally implied, whatever may be the [subject of insurance. It applies no less to insurances effected by the owner of goods, than to those effected by the owners of the ship.

The English doctrine of seaworthiness is, that there is no implied warranty of seaworthiness, except at the commencement of the voyage. The law in the principal commercial States of this Union, is at variance with the English rule, gives a wider extent to the implied warranty, and holds it to be the duty of the assured to keep his vessel seaworthy during the voyage, if it be in his power to do so; and if, from the neglect of the owner, or his agents, the vessel becomes unseaworthy, by damage or loss in her hull or equipments during the voyage, the owner must repair the damage or supply the loss at the port of refuge, refreshment, or trade. The underwriter will be discharged from liability for any loss, the consequence of such want of diligence. The American doctrine is qualified to this extent: that unseaworthiness arising after the commencement of the voyage, has not a retrospective operation, so as to destroy a just claim in respect of losses which have occurred prior to the breach of the implied warranty; and also, that, if the ship sailed seaworthy for the voyage, subsequent unseaworthiness shall not operate as a defence, except where the loss is distinctly shown to have been occasioned by it, and the unseaworthiness itself to have arisen from the negligence or misconduct of the assured, or his agents.

A protest is an important instrument; and where a captain, having met with a disaster, prepares and signs one, while the circumstances are fresh in his memory, setting forth the manner of its occurrence; and afterwards, when a litigation, involving a charge of misconduct against himself, has arisen, attempts, as a witness, to account for the disaster by statements of very material incidents of his voyage undisclosed by the protest, his testimony must be viewed with grave distrust, and cannot be considered as satisfactorily verifying the circumstances of the loss.

After the vessel sails, I do not think the insurers of a cargo liable to lose their insurance, for the errors of judgment, mistakes, or even negligence, of the master. The general rule laid down by elementary writers, as Phillips, and even Chancellor Kent, that the failure to take on board a pilot, where it is customary, renders the vessel unseaworthy, and avoids the policy, must be subject, in practice, to this distinction in favor of the insurers of cargo who have no interest in the vessel, or it would be a most unreasonable rule. *Preston,* J., dissenting.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Elmore* and *King,* for plaintiffs. *E. Briggs,* for defendants. By the court:

SLIDELL, J. This action is upon a policy of insurance for the value of goods shipped in the schooner Maria, on a voyage "from New Orleans to Brazos river and about twelve miles above Columbia." The vessel was wrecked in crossing the bar at the mouth of that river. The defendants resist the payment of the loss, on the ground that it was occasioned by the neglect of the master to employ a pilot in crossing the bar.

There was judgment for the plaintiff in the court below, and the defendants have appealed.

We consider it as satisfactorily resulting from the evidence, that it is custom- <span style="float:right">McDowell<br>*v.*<br>General Mu-<br>tual Ins. Co.</span> ary for vessels of the description of the Maria, to take a pilot in crossing the bar of the Brazos river; and the propriety of doing so is shown by the nature of the locality. It appears from the testimony, that there is a shifting bar and channel, and that it would not be safe to cross without a pilot. The absence of a pilot under such circumstances, must be considered as producing a positive and definite increase of risk.

It may be considered as well settled in American jurisprudence, that a master, in entering a foreign port where pilots are usually employed, is bound to approach the pilot ground with caution, and to use reasonable diligence to obtain a pilot. If he enters without a pilot, and the vessel grounds and is wrecked in doing so, the underwriters on ship are not answerable for the loss thereby sustained, unless it be shown that the reasonable diligence to obtain a pilot was unsuccessfully exerted, or that circumstances of impending danger rendered it unsafe to wait for a pilot, or that such other state of facts existed as would reasonably excuse the omission, by showing its necessity. See *Bolton* v. *American Insurance Company*, cited in 3 Kent, in note page 76. Phillips on Insurance, p. 315. *Keeler* v. *Firemen's Insurance Company*, 3 Hill, 250. 2 Greenleaf's Evidence, § 400. *McMillen* v. *Union Insurance Company*, 1 Rice, 248, cited in note, Kent, *supra*. See also 3 Kent, 289, *Patapsco Insurance Company* v. *Coulter*, 3 Peters, 235.

That the question of liability of underwriters, in case of the omission to take a pilot, is the same, whether insurance be on the ship or goods laden on board by third persons, seems clear. The subject of employing a pilot appears properly to fall under the head of seaworthiness, and is so treated by the commentators. Now, it is settled, that the warranty of seaworthiness is equally implied, whatever may be the subject of insurance, and applies no less to insurances effected by the owner of goods, than to those effected by the owners of the ship. See *Oliver* v. *Cowley*, cited in Park, vol. 1, p. 298. Ib. 306. Arnould, 654. 1 Phillips, 308. See also *Taylor* v. *Lowell*, 3 Mass. 347.

The owners of the goods are not without recourse. They have their remedy, for the consequences of the captain's neglect to take a pilot, against him and the owners of the ship.

It is proper here to remark, that although it seems to be the great leading principle of the English doctrine of seaworthiness, that there is no implied warranty of seaworthiness, except at the commencement of the voyage, yet the law in the principal commercial States of this Union, is at variance with the English doctrine, and gives a wider extent to the implied warranty. It holds it to be the duty of the assured to keep his vessel seaworthy during the voyage, if it be in his power to do so ; and if, from the neglect of the owner, or his agents, the vessel becomes unseaworthy, by damage or loss in her hull or equipments, during the voyage, the owner must repair the damage or supply the loss, at the port of refuge, refreshment, or trade. The underwriter will be discharged from liability for any loss, the consequence of such want of diligence. Kent, vol. 3, p. 288. Ib. 289. Arnould, 666.

The American doctrine, however, is qualified to this extent: that unseaworthiness, arising after the commencement of the voyage, has not a retrospective operation, so as to destroy a just claim in respect of losses which have occurred prior to the breach of the implied warranty ; and also, that if the ship sailed seaworthy for the voyage, subsequent unseaworthiness shall not operate as a

McDowell
*v.*
General Mutual
Ins. Co.

defence, except where the loss is distinctly shown to have been occasioned by it, and the unseaworthiness itself to have arisen from the negligence or misconduct of the assured or his agents. The language of Mr. Kent, with regard to this latter qualification, is very apposite, by reason of the illustration it gives, to the present controversy. "The owner," says he, "is bound to keep the vessel in a competent state of repair and equipment during the voyage, as far as it may be in his power. If this be not the case, and a loss afterwards happens, which could by any means be either increased or affected by a prior breach of the implied warranty of seaworthiness when the policy attached,—as, for instance, if the master should omit to take a pilot at an intermediate port, where he ought and might have done it, and the vessel be, two years afterwards, lost, by capture; or, if he sailed without sufficient anchors, and the vessel be afterwards struck with lighthing,—would the insurer be discharged? The better opinion would seem to be, that he would not be discharged." 3 Kent, 289. See also *Paddock* v. *Franklin Insurance Company*, 11 Pick. 227.

Mr. Arnould advocates the English rule, and considers it decidedly preferable, both as giving the assured a more complete indemnity, and also preventing many nice and difficult inquiries, which, in his opinion, the other system has a direct tendency to produce. But, it seems to us, on the other hand, that the American rule is more consistent with public policy, considered with reference to the preservation of life and property.

In the present case, the plaintiffs insist, that the captain did all he could to procure the services of a pilot; and in support of this proposition, they rely on the testimony of the captain, which is as follows:

On Tuesday, 30th April, 1850, at 5 o'clock, A. M., made Galveston Island, bearing Northwest. At 10 o'clock, A. M., made the mouth of the Brazos river. The bar, to appearance, was smooth, and, being abreast of it, (the bar,) hove the vessel to for a pilot, witness at the same time seeing the pilot boat making for his schooner. The pilot boat approached within hailing distance of the schooner, the schooner heading at that time to the South and West, the jib to windward and below her lee, and the pilot boat was on the same tack, at the stern of the schooner, gaining on her, when the pilot boat hailed the schooner and demanded if she wanted a pilot. Witness answered from the schooner, yes; what is the pilotage? They hailed again from the pilot boat, but witness could not hear distinctly what they said, but supposed it was to repeat the question, and witness returned the same answer. Whilst these questions were being propounded and answered, witness was standing by the lee main rigging, and having a man heaving the lead and reporting four fathoms of water. The pilot then bore away before the wind, and went on the opposite tack; and, as it is customary on the bar of Texas, for pilot boats to go in first, and for vessels to follow, I bore away after the pilot boat, and followed it for about half an hour; but not keeping up with the pilot boat, I set my signal for him to wait; but he not waiting, and the schooner not getting any farther off from the shore on this tack, witness put the schooner about and stood on the opposite tack. By putting the schooner about, she dropped astern, and was in three fathoms of water before she got headway; and, whilst standing on this tack, she not being able to clear the South breakers, and her anchor and chains not being able to hold her, witness kept her away and attempted to cross the bar. This was the only alternative, either to cross the bar, or drift on the North or South breakers. It was then about 1 o'clock, P. M. when the schooner got on the bar, and she commenced thumping; and, the

wind being light and dying away, [she lost her steerage way, and the current running very strong out of the river, swept the schooner on the Southwest point, &c.

In addition to this testimony, the plaintiff also offered the testimony of one of the seamen, which substantially accords with the captain's. These depositions were taken before a justice of the peace, after the answer was filed in the cause.

If the case stood upon this testimony alone, we might have concurred with the district judge, in holding the defendants liable.

But, a grave difficulty is presented, by comparing the testimony of the captain and seaman, taken after the refusal of the underwriters to pay the loss, on account of the omission to employ a pilot, with the protest made in Texas, a few days after the wreck, and signed by them. This instrument relates, with the usual detail of a log book, from which it would seem to have been copied, the circumstances of the vessel's voyage from New Orleans to the coast of Texas, giving, day by day, the winds, soundings, weather, accidents occurring on board, &c. We then find the following statement: "Tuesday, 30th, at 5 o'clock, A. M., made Galveston Island, bearing North-West; at 10 A. M., made the mouth of the Brazos River, the bar to appearance was smooth, the wind fresh from the South-East; at one o'clock, P. M., bore away, and stood on to the bar; but while crossing it, the wind died away, and before the anchors could be let go, the current, which was then running six miles per hour, swept the schooner on to the South-West point, where she commenced thumping on the bottom very heavy; immediately got out the boat, and carried out the anchor; and, at 10° P. M. succeded in bearing the schooner to the inner point (she thumping heavily all the time, and leaking badly), when the hawser parted, and she was again swept on the South point; it now required both pumps to keep her free; the wind light from the South-East, and continued so until midnight. Wednesday, May 1st, at 1, A. M., the wind began to increase; at 4, the wind still freshening; went on shore in the yaul, and borrowed an anchor from the schooner McNeil, and got the pilot boat and pilot's men, to assist in taking out the anchor, and to assist in heaving her off. At 5, returned to the schooner, and found she could not be kept free with both pumps, and that she had settled in the sand. Commenced heaving on the hawser, but found she did not move. At 8, A. M., she had gained on the pumps 2 feet water, and at 10, A. M., she settled down and soon filled to the deck, and became a total wreck; at which time, H. C. Wilcox, wreck-master, came off with two launches and twenty-two men, and began to strip the vessel and take out the cargo; two men would go under the water and hook on to articles, and the rest hoist them out, and took them on shore. The vessel was all the time gradually sinking, the wind continued fresh, and very little progress could be made in getting out the cargo. Thursday, May 2d, the schooner had sunk so, that the water was one foot on the deck. Worked all this day, but owing to the high sea, got out but little cargo. Friday, May 3d, at daylight went down to the wreck, found six feet water on the deck; we could get no more cargo out, and abandoned the vessel and cargo as it lay."

It will be observed that the protest is entirely silent, as to any attempt whatever, to get a pilot. No mention whatever is made of heaving to for a pilot, of speaking one, or even of having seen one, until many hours after the vessel had attempted to cross the bar, and was wrecked.

McDowell
*v.*
General Mu-
tual Ins. Co.

A protest is a very important and solemn instrument. We have indeed no law such as is contained in the celebrated *Ordonnance de la Marine* of France, in her existing Code de Commerce ; in the Codigo di Comercio of Spain, and the legislation of some other commercial nations, commanding captains of vessels to make protests or consulates ; yet, it is a matter of commercial usage to make them. Although not receivable in our courts as evidence for the masters, his owners or shippers, credit is often given to their contents by merchants and underwriters. Such an instrument usually is, as Mr. Abbott observes, and as every merchant and captain knows, a narrative by the master of the particulars of the voyage, of the storms encountered, the accidents which may have occurred, and the conduct which, in cases of emergency, he had thought proper to pursue. "He should take care," says Mr. Abbott, " to supply from the log-book, his own recollections, and that of the mate or trustworthy mariners, true and faithful instructions for its preparation."

When, therefore, a captain, having met with a disaster, prepares and signs a protest, while the circumstances are fresh in his memory, setting forth the manner of its occurrence, and afterwards, when a litigation involving a charge of misconduct against himself has arisen, attempts, as a witness, to account for the disaster, by statements of material incidents of his voyage, undisclosed by the protest, his testimony must be viewed with great distrust, and cannot be considered as satisfactorily verifying the circumstances of the loss.

In *Senat* v. *Porter.* 7 Term Rep., it was held, that the protest of the captain could be used to contradict his testimony.

Emerigon, who had not merely studied the law of insurance in books, but had a very large practical experience as an advocate and judge in the admiralty, says that a captain cannot impeach his own work, and say that he has betrayed the truth, or that he has not exhibited in his consulate all the important facts of the case. And, in another place, he observes : "Every captain who, having the power of making his consulate in due form, fails to do so, renders his conduct very suspicious." He cites the forcible language of Casaregis: *Ex qua omissione actûs soliti, facilis, et necessarii, oritur suspicio et presumptio, quod pretensum damnum navis non acciderit ex dicta causa.*

We must not be surprised therefore, says Emerigon, at the judgments, which having regard to the circumstances of fact, have rested on the want of a consulate, to decide the cause in favor of the insurers. He then cites a case which presents, as regards the master's conduct, a very strong analogy to the one before us. A captain borrowed a sum on maritime loan, his voyage being for the coast of Italy, Naples, Corsica and Sardinia. He went to Tunis, where he made no consulate, to show the necessity of his deviation. He there took on board a cargo of timber. He touched at Bastia, where he made a consulate, in which he said nothing as to the cause of his voyage to the Barbary coast. Having left Bastia, he was wrecked. Arrived at Marseilles, he made a consulate, by which he attested, that a storm had forced him to put into Tunis. The lenders objected, that the consulate should have been made at Tunis. The decree, in spite of the shipwreck, condemned the captain to pay the sum received on maritime loans, with the marine interest and land interest. See Emerigon (Meredith) p. 606. *et seq.*

Although in the tribunals of France, the rules of evidence, in matters of insurance, differ from our own, and the doctrines thus enunciated by Emerigon must therefore be considered with proper qualifications, their spirit commends itself to our reason, and may be invoked here in the investigation of truth.

It is therefore decreed, that the judgment of the district court be reversed, and that there be judgment of nonsuit, the plaintiff paying costs in both courts.

PRESTON, J., dissenting. The defence to this suit, on a policy of insurance on cargo, is that the loss claimed did not result from the perils insured against, but was caused by the willful neglect of the master to take a pilot on entering the Brazos River. This, it is contended on authority, rendered the vessel unseaworthy, and exonerated the underwriters.

The cause of the loss, as stated in the protest of the master and crew, evidently taken from the log book, was that the vessel attempted to cross the bar of the Brazos River under sail, but while crossing it the wind died away, and before the anchor could be let go, the current, which was running six miles an hour, swept the schooner on the Southwest point, where she commenced thumping; could not be got off, and sunk. The cargo, consisting of heavy machinery and brick, belonging to the plaintiffs, who were not owners of the vessel, was lost. The immediate cause of the loss was the dying away of the wind at the critical moment of crossing the bar, the rapidity of the current of the river over the bar forcing the vessel on a point where she thumped and sunk. These were perils of the sea insured against, and the loss must be borne by the insurers unless they can exonerate themselves from liability by the proof of facts having that effect. The burden is on them, and they undertake to show, that though the proximate causes of the loss were perils insured against, yet these were traceable to neglect and misconduct of the master in not having a pilot, where it was customary and necessary, thus rendering, in the language of books of authority, the vessel unseaworthy.

Now, the only two witnesses to the facts, which actually occurred, are the master and a seaman. Both state, that the master made all reasonable efforts to obtain a pilot, but without success. Their testimony, in this respect, is not in contradiction to the log-book and protest, but certainly makes additions to them, and is thereby, to some extent, impaired. Still the testimony is uncontradicted, while the defendants, by examining the pilots at the Brazos, could have entirely destroyed it if untrue. Being a question of fact, and with regard to which the district court gave full credence to the testimony of the witnesses, I think we should yield to his judgment as to the facts, and if so, to conclude that the loss was caused by *vis major*, the effect of force.

If we take it for granted that the log-book contains the whole of the facts, and that the master made no efforts to obtain a pilot, the case is still, in my judgment, on the meagre testimony before us, against the defendants. It is true three insurance officers, of New Orleans, have been examined in their behalf. Two were never at the Brazos, one has passed over the bar twice. They state that the bar is a shifting one, the channel changeable, that they do not consider it safe to attempt to cross without a pilot, and would not insure a vessel going to the port if it was understood that the captain was to be his own pilot. These are the opinions of witnesses who have no practical knowledge on the subject, for *Mr. Wilder* probably crossed the bar only as a passenger. They do not refer to the circumstances of this case. In it we are obliged to believe the master was a mariner by profession. It appears he was in command of a small schooner of fifty-five tons, which might have safely passed the bar, although a vessel of two hundred tons could not. The water on the bar was smooth and the wind fair. He was the owner of one-fourth of his vessel, and it was uninsured. Under such circumstances he attempted to cross the bar

McDowell
*v.*
General Mu-
tual Ins. Co.

himself. I cannot doubt that he exercised ordinary prudence, and that in the best exercise of his judgment he believed that he could cross the bar with his small schooner without a pilot, or he would not have risked his own property rather than pay three or four dollars pilotage.

The defendants have offered no proof, but the event, to show an entire want of judgment in the master. Success is undoubtedly the best criterion by which to test the judgment of men in every thing, but it is not so invariably correct as to dispense with the proof of bad judgment in case of misfortune. For the want of ordinary care and prudence the master would, perhaps, have forfeited the insurance of his owners on the vessel. But, in my opinion, the shippers and insurers of cargo forfeit their insurance only by their own negligence, and not by negligence on behalf of the master. Thus, the plaintiffs shipped, and insured their property, on a vessel which, it is not disputed, was seaworthy and properly manned when she sailed. It was a sufficient compliance with their warranty as to the master, that he possessed a general good character for care and skill in his profession. Perhaps, as insurers of cargo only, and in the very port where the insurance company was established, even an inquiry as to the general good character and capacity of the master is immaterial, because the insurers are bound to a knowledge on these subjects as well as the insured, and in fact take care, by officers, to obtain the same knowledge with the assured. As to the latter, he often ships his freight on the vessel by the master named, or whoever may go as master. The strict scrutiny of this subject is not required, as there is not the slightest impeachment of the general character or capacity of the master at the commencement of the voyage. And it is to be presumed to have been good until the contrary is shown by evidence. As, therefore, it is to be taken for granted, in this case, that the master possessed a general good character for care and capacity, when the cargo was shipped, the shippers must be exonerated from negligence or want of prudence in shipping the cargo on board his vessel.

After the vessel sails, I do not think the insurers of a cargo liable to loose their insurance for the errors of judgment, mistakes, or even negligence of the master. The general rule laid down by elementary writers, as Phillips and even Chancellor Kent, that the failure to take on board a pilot, where it is customary, renders the vessel unseaworthy and avoids the policy, must be subject in practice to this distinction in favor of the insurers of cargo, who have no interest in the vessel, or it would be a most unreasonable rule.

Mr. Arnould states, that it is the rule in England that the assured warrants the vessel as being seaworthy at the commencement, and not during the voyage ; but that it is settled in the United States that she must be kept seaworthy during the voyage, and thinks the English rule most eligible. As far as I can judge, there is some diversity of decisions in both countries, growing out of the extremely varying circumstances of particular cases. And, perhaps, the real error consists in elementary writers classing together cases and things that are dissimilar, and attempting to subject them to a general rule.

Thus, the unseaworthiness of a vessel, and the neglect to employ a pilot, are two different things, and not necessarily subject to the same general rule as to their effect upon insurance. The neglect of the master to employ a pilot, seems more assimilated to the neglect to set the proper sails, or to steer the right course, or to keep the necessary watch, or cast anchor when approaching breakers.

Now, for all losses, the proximate cause of which is one of the enumerated <span>McDowell</span>
risks, although remotely caused by negligence or unskillfulness of this character, <span>v.</span> <span>General Mu-</span>
it has over and over again been decided in England that the underwriters are <span>tual Ins. Co.</span>
responsible. The maxim *causa proxima non remota spectatur*, invariably
governs. *Bush* v. *The Royal Exchange Company*, 2 Barnwell and Alderson's
Rep. 73. *Walker* v. ———, 5 Ib. 173. *Bush* v. *Poulland*, Barn and Cress-
well Rep. 219. And in this country the Supreme Court of the United States
have fully adopted the same doctrine in three cases.

In the case of the *Patapsco Insurance Company* v. *Coulter*, I consider analo-
gous in facts and principle to the case under consideration. The insurance was
upon a cargo of flour, from Philadelphia to Gibraltar. The vessel was burnt by
the negligence or carelessness of the master, in Gibraltar, and the cargo was
lost. The Supreme Court of the United States, in so many terms, decided
that the underwriters were not discharged, it being admitted that the loss of the
flour was caused by the negligence or carelessness of the master. *The
Patapsco Insurance Company* v. *Coulter*, 3 Peters, 222. *The Columbia Insur-
ance Company of Alexandria* v. *Laurence*, 10 Peters, 507. *Waters* v. *The
Merchants' Louisville Insurance Company*, 1 Peters, 225.

This last case was a river risk, upon a steamboat, but declared by the court
to be assimilated to and governed by principles applicable to marine risks. The
court, after an elaborate opinion, came to the conclusion that the policy covers a
loss of the boat by fire, caused by the negligence, carelessness or unskillfulness
of the master and crew of the boat, or any of them, and that pleas to the effect
that the fire by which the boat was lost, was caused by the carelessness, neg-
lect or unskillful conduct of the master and crew of the boat, was not a defence
to the action, by the owners on the policy, or sufficient in law to bar their
recovery of the loss. The whole scope of the opinion goes as far as any
English decision, and further than I should be willing to go, for in effect the
owners of the boat were indemnified for a loss caused by their own agents, and
consequently by themselves.

It is by no means necessary to go so far as the Supreme Court of the United
States have gone in this case, to support the claim of the assured in the case
under consideration. They insured cargo, not on their own vessel. It is
alleged to have been lost by the neglect and carelessness not of their agents, but
of the master of a vessel which did not belong to them, and who was not under
their control. His general character for care and skill is not attacked. At most,
as has been seen, his general character is all that could be expected from the
assured or that he bound himself to warrant, and not all the particular acts of
the master on consequences of his omissions.

The fact that barratry is generally excepted from the risks insured when the
assured is an owner of the vessel, though not excepted when he is not an owner,
shows by analogy that there should be a distinction between the liability of the
insurer for the negligence or unskillfulness of the master as to the loss of the
vessel, and the loss of the cargo. As to the latter, it appears to me nothing but
a general character, at the shipping port, for negligence and unskillfulness, and
that unknown to the insurers should exonerate them.

There is another consideration in this case which is conclusive to my mind.
By the very terms of the policy, the plaintiffs are insured against the barratry
of the master. Surely, since the parties by express contract, agreed to insur-
ance against the crimes of the master, they, by implied contract, intended

McDOWELL
*v.*
GENERAL MU-
TUAL INS. CO.

insurance against his particular acts of negligence or unskillfulness. Such an implied agreement has been inferred, from insurance against barratry, in several decisions.

In the case of *Lowe* v. *Hollinsworth*, on which the defendants principally rely, it is probable the insured were owners of both ship and cargo, and if so, the master was agent of both. He violated a statute of George III, which expressly required that vessels should be navigated on the river Thames, under the direction of a competent pilot, because, as declared by the statute, the navigation was intricate and dangerous. No discretion was left to the master, and his employers were condemned to bear the consequences of his violation of law. So in the other case relied upon, of *Stanwood* v. *Rich*, the insurance was on the vessel, and Chief Justice Parker left it to the jury to decide whether the failure of the master to take a pilot, in the harbor of Boston, was such negligence as would discharge the underwriters. He did not, indeed, put their discharge on the ground that he was the agent of the insured, and that, therefore, the principals must suffer for the negligence of their agent; but it appears to me this was the true ground. I can see no more reason for discharging the underwriters from insurance on cargo on account of the negligence of the master, than for discharging the insurance on the stock of a store, on account of the negligence of the owner of the house, which caused the fire and loss, and *vice versa*.

For these reasons, I think the judgment of the district court should be affirmed.

Application for re-hearing refused.