438 So.2d 46 (1983)
PENINSULAR FIRE INSURANCE COMPANY, an Insurance Corporation, Appellant,
v.
William S. WELLS, Jr., Appellee.
No. AO-336.
District Court of Appeal of Florida, First District.
August 23, 1983.
Rehearing Denied September 26, 1983.
*48 George D. Gabel, Jr., James J. Taylor, Jr., of Wahl & Gabel, Jacksonville, for appellant.
Carl D. Dawson of Dawson, Galant, Sulik, Nichols & Levy, Jacksonville, for appellee.
NIMMONS, Judge.
Peninsular Fire Insurance Company appeals from an adverse judgment entered pursuant to a jury verdict in favor of appellee Wells.
Wells, a commercial fisherman and the owner of a fishing fleet including a shrimping vessel known as the "Foxey Lady," sued Peninsular to recover on a policy of marine hull insurance issued to cover certain marine risks.[1]
On February 19, 1980, the Foxey Lady sailed from Key West on a fifteen to eighteen day routine shrimping voyage to the "Tortugas Grounds" in the Gulf of Mexico off Key West. She was under the command of her captain, Julius Singleton. When she did not return and nothing was heard from Captain Singleton or anyone else regarding the fate of the vessel or its crew, Wells filed the instant suit on August 20, 1981, seeking recovery on the policy on the alternative grounds that the Foxey Lady sank due to perils of the sea or that she was lost due to barratry of the master,[2] both of which risks were covered under the policy.
Approximately six weeks prior to the June 21, 1982, trial, Peninsular located the Foxey Lady in Cartagena, Colombia. She had been stripped of her motors and equipment and was virtually a total loss. Meanwhile, Wells, who had made various efforts to discover the fate of the Foxey Lady developed a lead indicating that Captain Singleton was alive and living in Texas. Singleton was located, arrested and returned to Florida in October, 1981, on a charge of theft of the vessel. Singleton gave an unsworn statement to a State Attorney's investigator in Key West which was an exculpatory statement insofar as the alleged theft of the vessel was concerned although it tended to inculpate him in a marijuana smuggling scheme which, according to Singleton's statement, was initiated by Wells. Shortly thereafter, Singleton's deposition was taken and he refused to testify on Fifth Amendment grounds. We will address this statement further, infra, when we discuss appellant's point that the trial court erred in excluding Singleton's statement at trial, Peninsular having been unsuccessful in procuring Singleton's attendance at trial.
As grounds for reversal, appellant asserts: (1) that the trial court erred in denying its motion for summary judgment because the cause of the vessel's loss was its seizure by governmental authority, a peril excluded under the policy; (2) that the evidence at trial was insufficient to prove barratry of the master as the cause of the appellee's loss and thus Peninsular was entitled to a directed verdict; and (3) that the court erred in precluding Peninsular at trial from introducing Captain Singleton's statement as a declaration against interest. We affirm on all points.

I. SUMMARY JUDGMENT  THE SEIZURE EXCLUSION
Peninsular asserts that the evidence before the court on its motion for summary *49 judgment showed that the proximate cause of the loss was not the alleged barratry but the vessel's seizure.[3]
The policy provided for coverage of the following marine risks:
Touching the adventures and perils which this company is contented to bear and take upon itself, they are of the waters named herein, fire, lightning, earthquake, assailing thieves, jettisons, barratry of the Master and Mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein.
The policy excluded loss caused by governmental seizure:
Notwithstanding anything to the contrary contained in this policy, this insurance is warranted free from any claim for loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat, or any taking of the vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise... . (emphasis added)
We examine the record facts which were before the trial court to determine whether Peninsular was correct in its assertion that there was no genuine issue regarding the proximate cause of the loss, Peninsular contending that such cause was the excluded peril of seizure and not the covered risk of barratry. Movant Peninsular has a heavy burden of showing that there was no genuine issue of material fact remaining for trial. E.g. Visingardi v. Tirone, 193 So.2d 601 (Fla. 1967).
At some point after Peninsular located the Foxey Lady in May, 1982, Peninsular acquired two marine survey reports dated respectively July 18, 1980, and February 1, 1982, which reports were submitted by marine surveyors to the port captain of Cartagena.[4] From these reports, the following information is gleaned. The July, 1980, report indicates that the Foxey Lady arrived at Cartagena to undergo repairs on June 9, 1980, under the command of Captain Singleton. At the time of its arrival in Cartagena, it was in fairly good condition and the necessary repairs were estimated to take six days once the vessel went on drydock. At the time of the July, 1980, marine survey, four crew members, including Captain Singleton, occupied the Foxey Lady.
The subsequent report dated February 1, 1982, recites in part:
The vessel arrived at the port of Cartagena on June 9, 1980, from San Andres to undergo repairs. Subsequently, it sailed for Aruba and was seized by a coast guard of the National Customs, and it has remained in port since then.
* * * * * *
The vessel has been in port for over a year and its papers are in the hands of a lawyer. During this time the vessel was inactive and all its equipment and machinery were taken off.
The report stated that the vessel had been abandoned and was stripped of its main engine and that the engine room was in very bad condition. The hull was also described as being in poor condition. Overall, the Foxey Lady was described as being in very poor condition requiring major repairs estimated to take one month.
*50 There was no indication as to when the vessel was seized or the reason for its seizure. There was no indication as to whether the owner, had he known the whereabouts of the Foxey Lady, might reasonably be expected to have obtained the release of the vessel from the authorities. There was no indication of what became of the crew members. There was no indication as to whether the repairs recommended in the July 18, 1980, report were made and there is little indication as to its condition when it was subsequently seized although the February 1, 1982, report does state that the vessel "has been in port for over a year" and "during this time the vessel was inactive and all its equipment and machinery were taken off."
When the Foxey Lady was overdue from her routine fishing voyage, Wells notified the Coast Guard and his insurer. He also inquired of numerous persons including masters of other vessels regarding leads as to the fate of the vessel.
When Captain Singleton was returned to Florida in October, 1981, Wells took his deposition to attempt to discover what became of the Foxey Lady. Singleton, however, specifically refused to answer any questions concerning the vessel's fate, asserting his Fifth Amendment privilege.
Wells' affidavit, which was among the records considered by the trial court in denying Peninsular's summary judgment motion, stated that he had no knowledge of the location of the Foxey Lady until Peninsular located it in Cartagena and reported the same to Wells in May, 1982. He also stated that had he known of the vessel's whereabouts, he would have done whatever was necessary to recover it since it was worth more than the insurance coverage.
Peninsular's position is that it was entitled to summary judgment because the evidence which was before the court in connection with its summary judgment motion established, as a matter of law, that the seizure and not barratry of the master was the proximate cause of the vessel's loss. Peninsular relies in part upon Nautilus Virgin Charters, Inc. v. Edinburgh Insurance Company, 510 F. Supp. 1092 (D. Maryland 1981), aff'd 673 F.2d 1314 (4th Cir.1982), cert. denied, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). There the charterer's son, unbeknownst to the owner, took the chartered yacht TEHO beyond the navigational limits of the insurance policy, into the territorial waters of Columbia for the purpose of drug smuggling. On January 17, 1979, the Columbian Navy discovered 150 bales of marijuana on board, seized the vessel and arrested all persons on board. Three weeks thereafter, Nautilus, the charterer, was informed of the above by the United States Coast Guard and Nautilus made attempts to recover the vessel from the Colombian authorities but to no avail. When the insurance company denied the claim under the policy, the owners and Nautilus instituted suit to recover for the loss of the vessel. The court in Nautilus dealt with the interrelationship between barratry as a covered risk and seizure as an exclusion, the court ultimately concluding that the proximate cause of the loss was the seizure and that the insurance company was entitled to summary judgment. In reaching that conclusion, the court in Nautilus began its discussion of the proximate cause issue as follows:
The Supreme Court has defined "proximate cause" in the insurance field as being "that cause which is most nearly and essentially connected with the loss as its efficient cause." Standard Oil Co. v. United States, 340 U.S. 54, 58, 71 S.Ct. 135, 137, 95 L.Ed. 68 (1950).
The court in Nautilus relied in part upon the House of Lord's decision in Cory v. Burr, 8 App.Cas. 393 (1883), a case involving the barratry/seizure/proximate cause issue. There, the master committed barratry by taking his vessel, without the knowledge of the owner, into Spanish waters to smuggle contraband tobacco. While in Spanish waters, the vessel was seized by a Spanish revenue cutter. The owner's insurance policy covered barratry but excluded seizure. The Nautilus court quoted the Cory decision as follows:

*51 Now here they are "warranted free from capture and seizure and the consequences of any attempt thereat." It was argued that here they have not been warranted from barratry. That is true, but the barratry itself would have occasioned no loss at all to the parties insured. If it had not been that the Spanish revenue officers, doing their duty (they were quite right in that respect), had come and seized the ship, the barratry of the captain in coasting along there, covering as we should call it along the coast, in order that the small smuggling vessel might come and take the tobacco, would have done the assured no harm at all. The underwriters do undertake to indemnify against barratry; they do undertake to indemnify against any loss which is directly sustained in consequence of the barratry; and in this case, as I said before, I think the seizure was as direct a consequence of the barratry as could well be. But still, as Mr. Justice Field said, it was the seizure which brought the loss into existence  it was a case of seizure.
[510 F. Supp. at 1098]
As stated in Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co., 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1937):
[T]he proximate cause is the efficient cause and not merely incidental cause which may be nearer in time to the result. [302 U.S. at 562, 58 S.Ct. at 374]
* * * * * *
The cause which is truly proximate is that which is proximate in efficiency. That efficiency may have been preserved although other causes may meantime have sprung up which have yet not destroyed it, or truly impaired it, and it may culminate in a result of which it still remains the real efficient cause to which the event can be ascribed. [302 U.S. at 563, 58 S.Ct. at 374]
* * * * * *
All the consequences naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself. [302 U.S. at 565, 58 S.Ct. at 375]
See also Blaine Richards & Co., Inc. v. Marine Indemnity Ins. Co. of America, 635 F.2d 1051, 1054 (2nd Cir.1980); and 5A Appleman, Insurance Law & Pr. § 3254:
That cause is considered proximate which sets other causes in motion, and an intervening act is not a proximate cause unless it is efficient to break the caused connection. It is, therefore, the efficient cause which is considered, and not necessarily a mere incidental cause which may be nearer in time to the result. Thus, the mere operation of natural forces to which a disaster within the coverage of the policy has given place would not break the chain of causation.
No useful purpose would be served by prolonging our discussion of the barratry/seizure/proximate cause issue or Peninsular's motion for summary judgment.[5] We reject Peninsular's assertion of a virtual per se rule which would deny coverage any time there is both barratry of the master and a seizure. The proximate cause principles enunciated in the authorities relied upon by Peninsular do not support its claim of entitlement to summary judgment given the relative dearth of evidence which was before the trial court regarding the facts and circumstances surrounding the vessel's seizure including the particular point in time when the vessel was seized and its condition at the time of seizure. Moreover, unlike the situation in the Nautilus case, there is no indication as to whether the Columbian authorities would have continued to detain the vessel had the owner known of its whereabouts and sought its release. In the context of the facts which were before the court at the time of Peninsular's summary judgment motion, to hold as a matter of law that the *52 proximate cause of the loss or damage to the vessel was the seizure would be an unwarranted extension of the above-referred authorities and of generally accepted notions of proximate cause. The trial court correctly denied the summary judgment motion.

II. BARRATRY OF THE MASTER
We note that the policy's seizure exclusion was raised by Peninsular only in connection with its summary judgment motion. (See footnote 4, supra.) No effort was made to defend at trial on the basis of such exclusion. Indeed, no evidence was presented at trial indicating that the Foxey Lady had been seized at all. Therefore, in analyzing the issue regarding the sufficiency of the evidence at trial to prove loss due to barratry, we must disregard the marine survey reports considered on the summary judgment motion indicating a seizure inasmuch as no evidence of seizure was introduced at trial.
The testimony at trial concerning the ultimate location of the vessel was that it was finally discovered in its damaged condition in a port in Cartagena by Peninsular in May, 1982, over two years after it disappeared. Although Peninsular asserted as a defense at trial that Wells, as the insured, failed to take reasonably necessary steps to preserve and recover the vessel under the so-called "sue and labor" clause[6] of the policy and the jury was instructed on that defense, Peninsular has not asserted on appeal any error in connection with the jury's implicit rejection of that defense. We must, therefore, assume that the owner took reasonably necessary steps to recover and preserve the vessel.
Peninsular asserts on appeal that the evidence at trial was insufficient to prove barratry of the master as the cause of the owner's loss. An explanation of the generally accepted meaning of the term barratry as used in marine insurance policies is set forth in National Union Fire Ins. Co. v. Republic of China, 254 F.2d 177, 182 (4th Cir.1958):
The classic definition of barratry was given by Lord Ellenborough, C.J., in Earle v. Rowcroft, 8 East 126, at 138: "* * * a fraudulent breach of duty by the master, in respect to his owners; or, in other words, a breach of duty in respect to his owners, with a criminal intent, or ex maleficio, is barratry. And with respect to the owner of the ship or goods, whose interest is to be protected by the policy, it can make no difference in the reason of the thing, whether the prejudice he suffers be owing to an act of the master, induced by motives of advantage to himself, malice to the owner, or a disregard to those laws which it was the master's duty to obey, and which (or it would not be barratry) his owners relied upon his observing." The English Marine Insurance Act, 1906, Sch. I, Rule 11, provides: "The term `barratry' includes every wrongful act wilfully committed by the master or crew to the prejudice of the owner, or, as the case may be, the charterer." This definition is accepted in America as well as in England. Arnould, sec. 839; 1 Phillips on Insurance 5th ed., N.Y., 1867), sec. 1062; Patapsco Ins. Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659; Greene v. Pacific Mutual Ins. Co., 9 Allen 217, 91 Mass. 217. Wilful nonfeasance of the master, doing nothing, if productive of mischief to the owner, may be barratry. Patapsco Ins. Co. v. Coulter, supra. If the captain deviates, or is compelled by the crew to deviate the vessel from its proper course and to put into an unauthorized port in fraud of his or their duty to owners, it is barratry. So is unreasonable or criminal delay. Arnould, secs., 844, 847.
See also Fishing Fleet, Inc. v. Trident Ins. Co. Ltd., 598 F.2d 925, 927 (5th Cir.1979).
*53 Examination of the trial evidence leads us to conclude that there was sufficient evidence to warrant a finding by the jury that the master committed acts of barratry. Captain Singleton was authorized to take the Foxey Lady on a routine fishing voyage. The vessel disappeared and neither he nor any other crew member communicated with the owner. The owner, after reasonable efforts to determine the whereabouts of the vessel and its crew, finally located Captain Singleton 20 months later in Texas. He refused to answer any questions regarding the fate of the Foxey Lady.[7] The vessel was finally located in a severely damaged condition in a port in Cartagena, Colombia, 27 months after Captain Singleton disappeared with it. We hold that this constituted barratry and that the jury was warranted in concluding from the evidence at trial that the damage[8] to the vessel was a consequence naturally flowing from the barratry. No evidence was presented at trial which would break the chain of causation of barratry as the cause of appellee's loss[9] and the trial court properly denied the motion for directed verdict.

III. ADMISSIBILITY OF STATEMENT
At trial, Peninsular proffered the testimony of Allen Strickrott, an investigator with the State Attorney's Office in Monroe County, concerning the oral statement made to him by Captain Singleton upon his return from Texas. Peninsular claims that the trial court reversibly erred by sustaining Wells' objections thereto on the grounds of hearsay.
Singleton, who had been arrested and was at the time in custody on charges of the theft of the Foxey Lady, made an unsworn statement which purported to exculpate himself from the theft charges. The gist of the story he told Strickrott was that on the evening that the Foxey Lady left Key West, Wells instructed Singleton to take the vessel to a certain location where he would rendezvous with some Latin males who would board the vessel and that Singleton was to relinquish control of the vessel to them at which time they would proceed to Colombia. Singleton stated that, although Wells never mentioned drug smuggling, it was Singleton's understanding that such was the purpose of the voyage for which Wells was to pay Singleton $50,000 when Singleton safely returned the Foxey Lady. Singleton said that, as per Wells' instructions, he relinquished control of the vessel to the Latin males at Dry Tortugas after which they proceeded to Aruba and then on to Cartagena. They then proceeded on to Santa Marts, Columbia, where a deal was made for 30 tons of marijuana and Singleton said that he helped load the marijuana on board the vessel. Singleton said he was left ashore and next saw the Foxey Lady in a Colombian shipyard noting that it had been "shot up." He said he was unable to secure the vessel's release and spent the next year and a half "trying to figure out how he was going to return to the United States."
As previously noted, Singleton, after having given the above unsworn statement, was deposed in this case but refused to testify on grounds of self incrimination. It is undisputed that he was unavailable at trial, Peninsular having been unable to procure his attendance within the meaning of Section 90.804(1)(e), Florida Statutes (1981). Peninsular contends that the trial court erred in refusing to allow into evidence the statement of Singleton as a declaration against interest of an unavailable witness under Section 90.804(2)(c), Florida Statutes, which provides in pertinent part:
(2) Hearsay Exceptions.  The following are not excluded under s. 90.802, provided *54 that the declarant is unavailable as a witness:
* * * * * *
(c) Statement against interest.  A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject him to liability or to render invalid a claim by him against another, so that a person in the declarant's position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement. A statement or confession which is offered against the accused in a criminal action, and which is made by a codefendant or other person implicating both himself and the accused, is not within this exception.
Peninsular correctly contends that the above statute encompasses declarations against penal interest as well as those against pecuniary and proprietary interests. See Baker v. State, 336 So.2d 364 (Fla. 1976); Brinson v. State, 382 So.2d 322 (Fla. 2nd DCA 1979). However, we do not agree that Singleton's statement qualifies as a declaration against his penal interest within the meaning of the above provision of the Evidence Code. We do not believe that it can be fairly said that a person in declarant Singleton's position would not have made the statement described above unless he believed it to be true. Declarant Singleton had been returned from Texas and was in custody on account of the charge of the theft of the vessel. It is reasonable to infer that the theft charge was his immediate and overriding concern. Why not attempt to distract attention from himself by fabricating a drug smuggling conspiracy with the theft victim as the mastermind? The theory supporting admissibility of declarations against penal interest, i.e. the inherent reliability of such statements by reason of the lack of motivation of the declarant to fabricate, see Brinson v. State, supra, is absent in this case. The proffered testimony regarding Singleton's statement was inadmissible hearsay and the trial judge so ruled.
The judgment in favor of appellee Wells is therefore AFFIRMED.
JOANOS, J., concurs.
LARRY G. SMITH, J., specially concurs with opinion.
LARRY G. SMITH, Judge, specially concurring with opinion.
I concur in the opinion, the discussion, and the result reached on every issue, with one exception. I question the reviewability of the trial court's denial of Peninsular's motion for summary judgment.
As pointed out in the opinion, Peninsular sought a summary judgment on the ground that the loss of the vessel was caused by a seizure, coverage for which was specifically excluded under the policy. The trial court denied Peninsular's motion for summary judgment, and the case proceeded to trial. I see no occasion for us to re-visit a denial of summary judgment once the case has proceeded to trial and a judgment has been rendered based on the evidence at trial, as was the case here. Once the case has been tried, it seems to me, the merits of each claim or defense must be based upon the evidence presented at the trial, not on the paper issues presented on the motion for summary judgment. The majority opinion recognizes this to be the rule in the discussion under part II, "BARRATRY OF THE MASTER." There it is pointed out that since Peninsular failed to present at trial any evidence to support its defense of seizure, it was not entitled to have this court consider the marine survey reports (submitted by Peninsular in support of its summary judgment motion) in reviewing the sufficiency of appellee's evidence to prove barratry as the cause of loss.
Any other view would produce an anomalous procedure whereby a defendant, unsuccessful in his motion for summary judgment, would be entitled to have the factual basis for his defense determined on written affidavits, while the sufficiency of the *55 plaintiff's cause of action would be judged by the standards applicable to the traditional modes of proof at trial, where the manner and demeanor of the witnesses, the rigors of cross-examination, and considerations of logistics and expense (among other things) play a part in the final outcome. As pointed out in Home Indemnity Company v. Reynolds & Co., 38 Ill. App.2d 358, 187 N.E.2d 274 (1962), to allow review as appellant seeks here would permit a decision based on less evidence to prevail over a verdict based on more evidence.
The general rule regarding the reviewability of orders denying a motion for summary judgment is stated in an annotation on the subject, as follows:
Although as a general rule interlocutory orders that are not directly appealable are reviewable on an appeal from a final judgment in the action, this does not hold true for orders denying motions for summary judgment; such orders are ordinarily held not reviewable on an appeal from final judgment, except where the final judgment results from the granting of a motion for summary judgment by the opposing party.
Annotation, "Reviewability Of Order Denying Motion For Summary Judgment," 15 A.L.R.3d 899, at 902, § 2., "Summary and comment."
The general rule of non-reviewability of an order denying a motion for summary judgment on appeal from a final judgment must be, like many rules, subject to exceptions not easily reducible to a simple, categorical pronouncement. At least two courts of this state have indicated that such a ruling is reviewable on appeal from a final judgment. Crane Brothers Motors, Inc. v. Connell, 236 So.2d 138 (Fla. 2nd DCA 1970); Wynn v. Winsen, Ltd., 246 So.2d 639 (Fla. 4th DCA 1971). However, in neither case is review undertaken, and in neither case is there any discussion of the conditions under which such review would be permissible. That review is possible under certain circumstances is no doubt correct, as the general rule above stated and the cases cited in the A.L.R.3d annotation, supra, indicate. I do not feel that the two Florida cases cited would serve as authority for review in this case.

ON MOTION FOR REHEARING
NIMMONS, Judge.
Appellant's motion for rehearing suggests that we failed to properly apply Section 90.804(2)(c), Florida Statutes, regarding declarations against interest. Specifically, appellant says that we misapprehended the significance of the following portion of that section:
"A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement."
On the contrary, that portion of the statute has no applicability whatsoever to the type situation as that involved sub judice. The above provision contemplates the entirely different situation where a person accused of a crime seeks to exculpate himself by offering the statement of a declarant in which the declarant admits the crime.
The motion for rehearing is denied.
LARRY G. SMITH and JOANOS, JJ., concur.
NOTES
[1] State courts have concurrent jurisdiction with federal courts where, although the subject matter of the suit is of maritime origin, the claim is in personam and the common law of the state provides the remedy sought. 28 U.S.C.A. Sec. 1333 (the "savings to suitors" clause); Panama R. Co. v. Vasquez, 271 U.S. 557, 46 S.Ct. 596, 70 L.Ed. 1085 (1926); Rountree v. A.P. Moller Steamship Company, 218 So.2d 771 (Fla. 1st DCA 1969). However, maritime law, not state law, is applicable even though the action is brought in a state court. Wilburn Boat Company v. Fireman's Fund Insurance Company, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Still v. Dixon, 337 So.2d 1033 (Fla. 2nd DCA 1976).
[2] "Barratry" is defined and discussed infra in this opinion under the heading "Barratry of the Master."
[3] Judge Smith's concurring opinion questions the reviewability after final judgment of an order denying a motion for summary judgment, a position not asserted on appeal by appellee. Judge Smith cites to respectable authority from other jurisdictions for such proposition. However, the Florida cases referred to in his opinion, Crane Brothers Motors, Inc. v. Connell, 236 So.2d 138 (Fla. 2d DCA 1970), and Wynn v. Winsen Ltd., 246 So.2d 639 (Fla. 4th DCA 1971), indicate a contrary view. We would only point out that if an order denying a motion for summary judgment is not reviewable after final judgment, then such an order would not be reviewable at all since an interlocutory appeal therefrom does not lie. See Crane Brothers Motors, Inc. v. Connell, supra.
[4] The marine survey reports were the only evidence in the record of this case indicating any seizure. Although these reports were not introduced into evidence at trial (indeed, no evidence of seizure was offered at trial), the reports were filed and considered without objection in connection with Peninsular's motion for summary judgment.
[5] The relationship between the covered risk of barratry and the seizure exclusion is also treated in The Republic of China v. National Union Fire Insurance Co. of Pittsburgh, 151 F. Supp. 211 (D.Md. 1957), aff'd. in part and rev'd. in part, 254 F.2d 177 (4th Cir.1958), cert. denied 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958).
[6] "In case of any loss or misfortune, it shall be lawful and necessary for the assured, their factors, servants, and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the vessel named herein, or any part thereof, without prejudice to this insurance as to the charges whereof this Company will contribute as hereinafter provided."
[7] Captain Singleton's deposition in which he asserted his Fifth Amendment privilege was, without objection, read to the jury.
[8] No error has been asserted on appeal regarding the evidence at trial of the amount of appellant's loss or the damages awarded by the jury in the sum of $80,000.
[9] As previously noted, there was no evidence of any seizure presented at trial.