453 So.2d 844 (1984)
E.W. LAMBERT, E.W. Lambert, Jr., and Robert C. Seaver, Appellants,
v.
Brenda DOE, As Next Friend of Steven Doe, a Minor, Appellee.
No. AS-152.
District Court of Appeal of Florida, First District.
June 26, 1984.
Rehearing Denied August 1, 1984.
*845 Joe J. Harrell and Robert C. Palmer, III, Pensacola, for appellants.
Robert J. Mayes and Richard E. Scherling, Pensacola, for appellee.
NIMMONS, Judge.
This is an appeal by the owners of a Gulf Breeze apartment complex, Shoreline Apartments, from a verdict in favor of a 9-year-old male resident, Steven Doe[*] ("Steven"), who was sexually molested by another tenant, 12-year-old Sean Roe[*] ("Sean"). Steven, through his mother, Brenda Doe,[*] alleged that the appellants, as landlords of the apartment complex, negligently failed to take adequate precautions to prevent the reasonably foreseeable conduct of Sean. We affirm the judgment for compensatory damages but reverse the award of punitive damages.
In August and September, 1980, Sean sexually molested Steven on two occasions at the apartment complex. A third incident occurred off the premises at a school grounds. One of the two incidents occurring at the complex took place at the Does' apartment while Steven's parents were in another part of the apartment. The second incident occurred at Sean's apartment while Seans' parents were situated in another area of the apartment.
The Does moved into the Shoreline Apartments in March, 1980. The Roes had lived there for some time prior thereto. Sean was large for his age, approximately 5'4" tall and weighed 150-155 pounds whereas Steven was about 4'6" tall and weighed only 75 pounds. After the Does moved to the Shoreline Apartments, Steven's several encounters with Sean caused Steven to develop a fear of Sean. Sean threatened to beat him up, threatened to falsely accuse Steven of vandalism, threatened to shoot him with a gun, and Sean actually beat him up on one occasion. On other occasions, Sean twisted his arm and displayed a gun. Because of his fear of Sean and the various threats made by Sean, Steven was afraid to tell his parents what Sean had done.
Steven's mother observed a marked change in his previously outgoing personality. He became more withdrawn and stayed indoors more than was usual for him. Eventually, on September 24, 1980, *846 he told his mother of the incidents. Mrs. Doe reported these incidents to the management of Shoreline. The resident manager then notified Sean's parents that they must vacate their apartment within three days. The manager's letter stated, in part:
Several months ago we asked you to vacate your apartment because of your son's behavior. Due to the hardship this would place on your family at that time, you were granted an extension.
Sean and his family moved out several days later.
There was substantial evidence presented to show that the management of Shoreline had received, several months prior to the subject incidents, reports of assaultive and bizarre conduct by Sean. We summarize the evidence. Sometime prior to June 1, 1979, according to Vicki Mann, the then resident manager of Shoreline, Sean made two little boys take down their pants and jump up and down in front of the window in his apartment. After that incident, Mrs. Mann told her own child to stay away from Sean. In August, 1979, a tenant, Mrs. Smith[*], reported to Judy Wilburn, Shoreline's project manager, that her three-year-old son had been sexually molested by Sean and that the tenant's sister had been a witness to the incident. This tenant moved away from the Shoreline the following month because the Shoreline management did not require Sean's family to move.
John Schmidt, a maintenance employee at Shoreline, testified that he heard Mr. Smith tell the resident manager, Vicki Mann, that Sean had molested his son and another young boy.
Judy Wilburn advised the owners of Shoreline (the appellants) of the report of the Smith molestation. The owners, who gave Wilburn wide latitude in handling problems since the owners resided in Tennessee, told her to consult with their attorney. She did and the attorney advised her there was not enough evidence to evict Sean's family.
Approximately two months after the Smith incident, Wilburn employed Terry Hardy, a deputy sheriff with the Santa Rosa County Sheriff's Office as a part-time security guard. He was a tenant at Shoreline. In November, 1979, Wilburn asked him to investigate reports that Sean had sexually molested younger boys in the complex. She did not specifically mention to him the Smith incident or give him the name of the witness to the Smith molestation. Hardy contacted the parents of several children and asked for permission to talk to the children. Although he was permitted to speak with only one child, he also requested the parents to speak with their children in an effort to determine what Sean had been doing. Hardy did not uncover any concrete information. He did file a report with the Sheriff's Office, but he said the report did not reveal any facts showing misconduct on the part of Sean. He further testified, however, that he realized that some of the children were hesitant to talk to him because they were afraid of Sean and that Judy Wilburn was aware of this.
John Schmidt, the maintenance employee at Shoreline, testified that he had several problems with Sean beginning in 1979. He described an incident wherein Sean threw eggs at people from his apartment doorway and then slammed the door on Schmidt's hand. He testified that on another occasion, Sean kicked in some air conditioners. Schmidt said that another time he found Sean's pet hamster burned to death under Sean's apartment window. When he asked Sean where his hamster was, Sean told him that the hamster had run away. Schmidt said that he had also seen Sean torturing his own cat. Schmidt also testified that he was aware of the fact that Sean had access to firearms. He described an incident in which Sean pointed a gun at a babysitter. On another occasion, a nine-year-old girl informed Schmidt that she had seen Sean and another boy in the woods engaged in sexual acts.[1] Schmidt said that Sean was *847 always hanging around younger children and instigating them to do things they should not. Schmidt testified that he informed Judy Wilburn and Connie Calhoun (the resident manager who succeeded Vicki Mann in September, 1979) that Sean posed a threat to small children at the Shoreline.
Connie Calhoun testified that Sean told her one day, several months before the incidents involving Steven, that Sean had killed his cat and asked for a shovel to dig it up. She also said that one of the maintenance employees told her that Sean liked little boys rather than little girls which Mrs. Calhoun took to mean that Sean was prone to make sexual advances towards small children.
Judy Wilburn and Connie Calhoun discussed evicting the Roes because of Sean's conduct but took no such action because they felt there was not sufficient evidence. Schmidt testified that Wilburn and Calhoun went to see the Roes and informed them that they would have to vacate but Mrs. Roe cried and Wilburn relented. Wilburn said that she saw Sean pester children in the complex and that she considered him a nuisance. Apparently, the only warning which Mrs. Doe received from the Shoreline management regarding Sean was Wilburn's comment to Mrs. Doe one day that Sean was a "bully." Mrs. Doe testified that after the revelation of Sean's molestation of Steven, Wilburn told Mrs. Doe, "I knew why Sean was hanging around the courtyard where all the younger kids were, because he was looking for another victim."
The Roes' lease had expired approximately seven months before the molestation incidents involving Steven Doe. After the lease expired, the Roes were permitted to remain on a month-to-month basis until the Shoreline management notified them to vacate after the revelation of the subject incidents in September, 1980.
Police Officer Ralph Barker testified that upon receiving the complaint of sexual battery against Sean Roe, he proceeded to the Shoreline Apartments and took Sean into custody. He said that he then took a statement from Sean. Over defense objections that such statement was inadmissible hearsay and inadmissible under Section 39.12(4), Florida Statutes (which objections we address later), Officer Barker was allowed to relate what Sean told him. Sean told Barker of instances where he had forced three young boys, including Steven Doe, and two young girls to perform fellatio upon him. Sean said there were two such incidents involving Steven, one at Sean's apartment and one at Steven's apartment. Sean said that he was able to get the children to do what he demanded by threatening them with bodily harm and threatening to accuse them of committing acts of vandalism. Sean also said that he told Steven that he would shoot Steven's mother and father. Sean told Officer Barker that "his mind was busted into two different brains, and he always done (sic) what one or the other said to him."
Mrs. Doe testified that before they moved to the Shoreline Apartments in March, 1980, she told the Shoreline management that she wanted to make sure that it was a nice, safe place for her family. The management assured her that it was a very nice place, that it had 24-hour security and that they did not have any trouble with any of the tenants.
A landlord, who as in this case recognizes and assumes the duty to protect his tenants from foreseeable criminal conduct, is required to take reasonable precautions to prevent injury from such conduct. Ten Associates v. McCutchen, 398 So.2d 860 (Fla.3rd DCA 1980); Holley v. Mt. Zion Terrace Apartments, Inc., 382 So.2d 98 (Fla. 3rd DCA 1980). It makes no difference, at least under the circumstances of this case, that the offender happens to be another tenant in the apartment complex.
*848 Enough information was known by Shoreline management about Sean Roe such that it knew or should have known that it was reasonably foreseeable that Sean would continue to victimize young children in the complex. As is obvious from the above summary of facts, Sean's behavior was not such as could be dismissed with a "boys-will-be-boys" attitude. His aberrant and bizarre conduct was in a different league and reflected what must be regarded, even to a layman, as at least a severe personality disorder. This unfortunate young man was a veritable time bomb ready to go off at any time.
Appellants point to the fact that the two incidents involving Steven at the complex occurred, respectively, in Steven's apartment and Sean's apartment while the parents were in the apartment. Although this argument has surface appeal, we do not believe that the landlord was any less obligated to take precautionary measures to prevent Sean from continuing to victimize young children in the complex simply because the molestations occurred inside, instead of outside, the apartments. The nature of the offensive acts perpetrated by Sean upon the younger children at the complex was such that they were done secretly and surreptitiously, and it was foreseeable that Sean would coerce his young victims into submission while in the privacy of an apartment bedroom. The fact that a parent or parents may have been present in another part of the apartment (oblivious to the events occurring in the bedroom) does not absolve the landlord from the duty of warning Steven's parents of the threat posed by Sean or taking other reasonably available precautions to avoid Steven and the other young children in the complex from continuing to be victimized by Sean.
Once a duty exists, the question of whether a landlord breached his duty to protect tenants from reasonably foreseeable criminal activity is usually a question for the jury, and it is for the jury to determine what precautions are reasonably required of the landlord in order to protect its tenants from further foreseeable criminal activity. Ten Associates v. McCutchen, supra, 398 So.2d at 862; Holley v. Mt. Zion Terrace Apartments, Inc., supra, 382 So.2d at 100; cf. Russell v. Jacksonville Gas Corp., 117 So.2d 29, 32 (Fla. 1st DCA 1960).
After the expiration of the Roes' lease, the landlord could have required the Roes to vacate without having to give a reason. Indeed, the landlord started to do just that but relented in the face of the pleas by Mrs. Roe. Even before the lease's expiration, the landlord surely would have had sufficient grounds to terminate the lease and require the Roes to vacate.[2]
Since the landlord opted to allow Sean's family to continue residing at the complex, the jury could have properly concluded that the landlord should reasonably have been expected to warn new tenants, such as the Does, of the potential threat posed by Sean Roe to young children in the complex, notwithstanding the landlord's fear that such warning might have exposed it to a possible slander suit.
The jury's verdict included an award of punitive damages in the sum of $25,000. Appellants contend that the trial court should not have allowed the issue of punitive damages to go to the jury as the evidence was not sufficient to support such an award. We agree with appellant. In order for appellants to be vicariously liable for punitive damages, their employees must have engaged in willful, wanton or outrageous conduct while acting within the scope of their employment and the appellants/employers must also have been guilty of some fault which foreseeably contributed to the injury. Mercury Motors Express, Inc. v. Smith, 393 So.2d 545, 549 (Fla. 1981); Leon County Humane Society, Inc. v. DeGroat, 439 So.2d 949 (Fla. 1st DCA *849 1983). The conduct of appellants' employees at the Shoreline Apartments was not such as will support punitive damages. In our view, their conduct constituted only simple negligence. We need not, therefore, address the appellants/employers' "fault," the other element necessary to support an award of punitive damages against an employer on the basis of vicarious liability.
Appellants also contend that the court erred in permitting Officer Barker to testify as to the statements made to him by Sean Roe. First, appellants say that such testimony was inadmissible hearsay. We disagree. It was conceded by counsel at trial that Sean was unavailable to testify. This testimony of Officer Barker qualified as a declaration against interest of an unavailable witness under Section 90.804(2)(c), Florida Statutes. The statements made by Sean were statements against penal interest and the statute's reference to "pecuniary or proprietary interest" has been construed to encompass penal interest. See Peninsular Fire Insurance Co. v. Wells, 438 So.2d 46 (Fla. 1st DCA 1983); Baker v. State, 336 So.2d 364 (Fla. 1976); Brinson v. State, 382 So.2d 322 (Fla. 2nd DCA 1979).
Appellants also contend that Sean's statements were inadmissible by reason of the provisions of Section 39.12(4), Florida Statutes (1981), which provides:
(4) Except as provided in subsection (7), all information obtained pursuant to this chapter in the discharge of official duty by any judge, any employee of the court, any authorized agent of the department, the Parole and Probation Commission, the Department of Corrections, or any law enforcement agent shall be confidential and shall not be disclosed to anyone other than the authorized personnel of the court, the department and its designees, the Department of Corrections, the Parole and Probation Commission, law enforcement agents, and others entitled under this chapter to receive that information, except upon order of the court.
Preliminarily, we would point out that no argument has been made, either at trial or on appeal, that Sean's statements were tainted by being involuntarily exacted or that such statements were inadmissible by reason of any failure to properly caution or advise Sean of his rights.[3]
The purposes of Chapter 39, which are stated in Section 39.001 are, in summary, to protect society by substituting, whenever possible, methods of rehabilitation for retributive punishment; to assure proper home environment for those children whose conduct or status has caused them to be brought before the court; to preserve and strengthen the child's family ties whenever possible; to provide procedures that will assure children of fair hearings; and to assure that the prosecution and disposition of children charged and found to have violated the law are conducted in such manner as meets constitutional standards of fundamental fairness. The confidentiality provisions of Section 39.12(4) are intended for the protection of juveniles and are not intended to be used by an allegedly negligent landlord as a shield against liability for damages arising from such negligence. The juvenile involved in the instant case, Sean Roe, was neither a party nor a witness and made no assertion that he was entitled to the benefits of the provisions of Section 39.12(4). We are not persuaded that the ends of justice would be served by interpreting this section in such a manner as to require that the trial court, notwithstanding the absence of any objection by or on behalf of the juvenile, exclude highly relevant and material testimony such as that elicited from Officer Barker.[4]
*850 We have examined the remaining points urged by appellants and find them to be without merit. The award of punitive damages is REVERSED. Otherwise, the final judgment is AFFIRMED and the case remanded for the entry of an amended final judgment reflecting the deletion of punitive damages.
THOMPSON and BARFIELD, JJ., concur.
NOTES
[*] Due to the nature of the activities involved in this case and the fact that several children were affected by such activities, we have chosen to use fictitious last names for such children and their parents in order to avoid unnecessary publication of the identity of such children. An asterisk will indicate when a fictitious last name is used.
[1] Apparently, this was the same incident described by John Imboden, another Shoreline maintenance employee. Imboden testified that he was present during a confrontation between a Mrs. Jones[*] and Judy Wilburn over an incident in which Sean had taken Mrs. Jones' small child into the woods.
[2] We note that the lease gave the landlord the right to terminate the lease "if Tenant or his guest carry on any activity which landlord or landlord's agents deem to be a nuisance or annoyance to landlord or any other tenant... ." Judy Wilburn admitted that they would have had no difficulty in showing Sean to be a nuisance to the landlord and other tenants.
[3] There was testimony from Officer Barker that he advised both Sean and his father of Sean's constitutional rights.
[4] That is not to say that the trial court would have erred if it had seen fit to enforce Section 39.12(4) by precluding the testimony of Officer Barker. We are of the view that the court would be empowered sua sponte to raise on behalf of the absent juvenile the provisions of Section 39.12(4) and to preclude such testimony in the absence of an order of the court having juvenile jurisdiction. Cf. Holston v. State, 208 So.2d 98 (Fla. 1968). We note, however, that there is a dearth of evidence in the record of this case establishing that there was, subsequent to his arrest, a prosecution of a juvenile case against Sean Roe with respect to the subject charges. In the absence of the prosecution of a Chapter 39 proceeding against the juvenile, the question arises as to whether the "order of the court" referred to in the last clause of Section 39.12(4) would necessarily have to be entered by a circuit judge presiding in a juvenile proceeding or could be entered by the circuit judge presiding over the civil trial. We need not answer that question in view of our disposition of appellants' Section 39.12(4) point on other grounds.