900 So.2d 587 (2004)
Juan Carlos VAZQUEZ, as personal Representative of the estate of Victoria Valle, deceased, and on behalf of Jaclyn and Andrews Valle, the minor natural children of the decedent; and Carmen Martin, individually, Appellants,
v.
LAGO GRANDE HOMEOWNERS ASSOCIATION and Centurion Protective Services, Inc., Appellees.
Nos. 3D03-1234, 3D03-961.
District Court of Appeal of Florida, Third District.
December 8, 2004.
Rehearing and Rehearing Denied and Rehearing Granted in Part May 6, 2005.
*588 Podhurst Orseck and Joel S. Perwin; Beckham & Beckham and Pamela Beckham; Stabinski & Funt and Todd Stabinski; Friedman Rodman & Frank and Ronald Rodman, for appellants.
Hunter, Williams & Lynch and Christopher Lynch; Butler Pappas Weihmuller Katz Graig and Anthony J. Russo; Ponzoli Wassenberg Sperkacz & Keller and Ronald Ponzoli, for appellees.
Before SCHWARTZ, C.J., and COPE and FLETCHER, JJ.
Rehearing and Rehearing En Banc Denied and Rehearing Granted in Part May 6, 2005.
SCHWARTZ, Chief Judge.

I.
This is an appeal from judgments entered for the defendants Lago Grande Homeowners Association, a condominium association, and Centurion Protective Services, Inc., the security company it hired to protect its premises, notwithstanding a jury verdict for the plaintiffs in consolidated wrongful death and personal injury actions. The cases arise from a shooting incident perpetrated by the ex-husband of a guest of a unit owner who, though the security guards on duty were specifically warned not to do so because of his potential dangerousness, was negligently permitted access to a condominium apartment. After gaining entry, he shot and killed his ex-wife, shot and wounded another occupant and then committed suicide. We reverse the judgments under review.

II.
We draw the factual and procedural history of the case from the appellants' brief which correctly treats the record in the light most favorable to the verdict:
The Lago Grande complex is bordered by S.W. 87th Avenue (Galloway Rd.), 122nd Avenue and 68th Street, containing 1,100-1,300 units with 2500-3000 residentsowners and renters. There are three entrances, on the north, east and south sides, each containing a guardhouse. There is a 5-6 foot wall around the entire perimeter, interspersed with sections of six-foot fencing. The developer first began selling units in 1984, when the Homeowners Association was created; it took over management of the property in 1988.

*589 The developer advertised the complex on the basis of safety, and collected a specific part of the condominium fee for the safety provisions offered by the complex. Although the Defendants argued that the guards at the complex were only there to monitor the comings and goings of residents and guests, the President of the Homeowners Association verified that they were there to protect the safety of residents and guests, and that the residents and guests had a right to expect that the complex would be safe, as promised, and that all visitors, as promised, would be screened. She also acknowledged that Lago Grande had delegated to Centurion its own responsibility for the safety of the residents.
To that end, Miami Management secured bids for security services, and the Homeowners Association Board eventually hired a company called Florida Patrol. It was given by the Board a set of protocols, called Post Orders, which required the guards at all three stations to stop everyone entering the complexresident or visitor, in a car or on foot; check the I.D. cards which all residents were given; and in the case of visitors, call the resident being visited to obtain permission to let the visitor come in. If the resident said no, the visitor would be asked to leave, and if necessary the police called. This was ¶3.3 of the Post Orders, which was specifically promulgated to protect the security of the residents. When Florida Patrol abruptly walked off the job in June of 1993, Lago Grande turned to the previous low bidder, Centurion, which took over the job the same day. Centurion specifically agreedindeed contractedto obey the existing Post Orders.
There were numerous complaints to Lago Grande that visitors were not being logged in, and were entering the complex without authorization. This was especially true of people on foot. In the Plaintiffs' expert's review of a year of security logs, pedestrians were very rarely logged in, or residents called before their admittance. This of course directly violated Centurion's contractual obligation to obey the Post Orders.
Centurion protested that it asked Lago Grande to hire more station guards and a second roving guard, and to put up a fourth gate, but was told the complex couldn't afford them; and the Plaintiffs' expert agreed that the complex was understaffed. The expert testified that Centurion should never have accepted the contract, and with it the responsibility of adequately policing the complex, if the funding was not sufficient for that purpose. However, the expert also testified that there were enough people on duty at the north guardhouse on the night of this tragedyanywhere from two to three guardsto have stopped Frank Valle from entering, and killing his wife.
The Valles were not residents of Lago Grande. However, their former neighbor, Carmen Martin, had moved to Lago Grande (her house was two streets from the north entrance) because it was "safe, secure and it was gated"; and Victoria and her children, Jaclyn and Andrews, visited Mrs. Martin at Lago Grande almost every day. Frank Valle, Victoria's estranged husband, also came to the complex to pick up the children, until Mrs. Martin had quarrels with him, and told him not to come back to her house. When Frank continued to enter the complex even after that, Carmen went to the north guardhouse and specifically told the guards to call her if Frank showed up again, and not to let him in. That, of course, was their standard protocol anyway. Had they followed it, *590 Carmen Martin would have instructed that he not be admitted, and according to the Plaintiffs' expert, this tragedy would not have occurred.
Instead, at 7:45-8:00 p.m., as his son Andres [sic] Valle, who was playing outside, watched, Frank Valle walked through the north entrance into the complex, unimpeded. He walked right through the middle of the entranceway, between the two gates which are set up for visitors and residents. He wasn't calm or rational; he was acting strange. He walked into Carmen Martin's house, which was unlocked, holding a revolver; confronted Victoria Valle inside; talked to her for 15-20 minutes; shot her in the stomach and then in the back of the head, killing her; and then shot Carmen Martin when she tried to run out of the apartment.
The Plaintiffs' expert witness was Dr. Randall Atlas, an architect, criminologist and security specialist. Without objection, Dr. Atlas testified extensively concerning the duties which both Lago Grande and Centurion assumed to protect the safety of Lago Grande's residents and guests. The bottom line is that Lago Grande assumed and contracted to fulfill a duty to protect the safety of its residents and guests, and Centurion assumed a contractual obligation to do so.
Without question, Centurion assumed a contractual obligation to protect the safety of the residents. Dr. Atlas also said that regardless of any general obligations of a landowner or condominium association under Florida's common law, once Lago Grande advertised security and collected a fee for providing it, it was required to do so with reasonable care:
So the challenge here is that once the developer chose to make security a selling point, they marketed security as a selling point, and it's mentioned in some of the memos they've got here about how they marketed and that this is going to be a safe place and now "we're living in a living hell" is one of the [resident's] memos addressed here that I saw.
And once they chose to put in the walls they had a duty to maintain the walls. Once they chose to put in a gatehouse, they had a duty to man it. Once they chose to man it, then they had a duty to make sure it was operated well and supervise it. Once you had a duty to have lighting, you have a duty to maintain that lighting.
* * * * * *
What I read into that [resident's memo] was the fact that when you went to the leasing agent, whether it is the property management company and that you are renting an apartment, that they are marketing the idea that this is a safe gated community, we have security guards, we have walls, we have, you know, rovers with little cars or whatever, then they are marketing the fact that security is a priority in this complex.
* * * * * *
Here it is. A Vivian Alvarez writes February 11 1992 . . . that they picked Lago Grande for "its security and quiet atmosphere, now it is a living hell." "The property is marketed as a secure gated community and did not take the necessary steps to implement."
This testimony was confirmed by the President of the Homeowners Association. She confirmed that security was in place at Lago Grande "to make it a safer community . . ."; that the rules instituted by the developer were "still the *591 same" "at the time of this incident", and "Lago Grande was still required to maintain the security company", absent a two-thirds vote of the residents amending the rules; and that therefore "it was reasonable for Mrs. Martin to expect to have her visitors to be screened before coming in and [that] they be announced". She also said flatly that although the Homeowners Association had hired numerous companies to perform its obligationslike pool maintenance and lawn services, and securityall of these remained Lago Grande's responsibilities.
According to Dr. Atlas, both Lago Grande and Centurion were negligent causes of this tragedy. He said the security at this complex was grossly inadequateboth in design and implementation. In design, he blamed Lago Grande, in part for too few guards, both roving and at the stations. Moreover, Lago Grande was negligent in failing to insure that the Post Orders were complied with. He blamed Centurion in part for contracting to provide adequate security with inadequate resources. In implementation, the guards were grossly negligentin general and on this occasionin failing to log in visitorsespecially those on foot. He said that this specific incident could and should have been prevented, by the three guards at the north guardhouse at the time Frank Valle walked right through the center of the north entranceway, undetected. And he said that if the guards had stopped Frank Valle, this murder would not have occurred.
The plaintiffs originally sued three defendantsLago Grande Homeowners Association, Miami Management, Inc., and Centurion Protective Services, Inc. The amended complaint alleged that Lago Grande had the "power, authority, and legal duty to provide adequate security for the residents and guests of the condominium complex, including Plaintiffs and Plaintiffs' decedent." Centurion "was [allegedly] responsible for providing security guard personnel to the condominium complex."
In the order now on appeal, the trial judge summarized the plaintiffs' evidence: "Viewed in a light most favorable to the Plaintiffs, the evidence at trial was that Frank Valle, the father of Plaintiffs Jaclyn Valle and Andrews Valle, came through a guarded entrance to the Lago Grande complex without being challenged, went to the apartment of Plaintiff, Carmen Martin, where he shot to death Victoria Valle, . . . shot Carmen Martin in the leg, and then committed suicide in the presence of his daughter, Jaclyn Valle." Moreover, "the guard service had previously been told by Carmen Martin not to admit Frank Valle to the complex. . . . Carmen Martin asked that he not be allowed into the complex because she was upset with his conduct during prior visitation with his son, Andrews." The jury found both defendants negligent, allocating 90% of the fault to Centurion, 9% to Miami Management (a Fabre non-party), and 1% to Lago Grande. It awarded $3.15 million to Jaclyn Valle; $1.67 million to Andrews Valle; $362,500.00 to Carmen Martin; and $25,000.00 to Rolando Martin.
Centurion and Lago Grande moved for judgments in accordance with their prior motions for directed verdict. They argued (1) that neither defendant had any duty to prevent the death of Victoria Valle in the absence of prior similar crimes at the condominium complex or any information suggesting that Frank Valle was a dangerous person[1]; (2) that Centurion's contract with *592 Lago Grande required only that it direct traffic at the entrances of the complexnot provide security; and (3) that there was no evidence of negligence by Centurion. After extensive discussion of these questions at the post-trial hearing, the court rejected the second and third arguments, with which we agree, but accepted the first, with which we do not.

III.
As has been seen, the trial court's ruling was based entirely[2] upon its conclusion that, as a matter of law, and notwithstanding the plaintiffs' reliance upon abundant evidence that both the association and the security company had undertaken the duty of exercising reasonable care to secure condominium occupants from criminal activity of just the kind which actually occurred, evidence of prior such crimes (which the court found was not introduced)[3] was required to justify liability.[4] There is no support in the law, prior precedent or legal logic for this determination.[5]
In the situation in which a duty to prevent harm from criminal activity arises only as an aspect of the common law duty to exercise reasonable care to keep the premises safe, prior offenses, giving rise to the forseeability of future ones, may be deemed indispensable to recovery. See Prieto v. Miami-Dade County, 803 So.2d 780 (Fla. 3d DCA 2001), review denied, 823 So.2d 125 (Fla.2002); Metropolitan Dade Co. v. Ivanov, 689 So.2d 1267 (Fla. 3d DCA 1997), review denied, 698 So.2d 543 (Fla. 1997); Ameijeiras v. Metropolitan Dade Co., 534 So.2d 812 (Fla. 3d DCA 1988), review denied, 542 So.2d 1332 (Fla.1989); Levitz v. Burger King Corp., 526 So.2d 1048 (Fla. 3d DCA 1988); Admiral's Port Condo. Ass'n v. Feldman, 426 So.2d 1054 (Fla. 3d DCA 1983), pet. for review denied, 434 So.2d 887 (Fla.1983); Medina v. 187th Street Aparts. Ltd., 405 So.2d 485 (Fla. 3d DCA 1981); Ten Associates v. McCutchen, 398 So.2d 860 (Fla. 3d DCA 1981), review denied, 411 So.2d 384 (Fla.1981); Winn-Dixie Stores, Inc. v. Johstoneaux, 395 So.2d 599 (Fla. 3d DCA 1981). Otherwise, a duty and thus a perhaps intolerable burden to provide reasonable security might exist in every instance. Cf. Johstoneaux, 395 So.2d at 600 n. 4 ("We have not implied either in the cited cases or in this one that when criminal activity is foreseeable it is invariably a jury question as to whether the duty of reasonable care has been discharged. *593 In the case of a mom-and-pop store with one or two employees, for example, it might be unreasonable as a matter of law to require that a full-time guard be posted.").
In contrast, the duty to guard against crime in this case is founded upon particular undertakings and hence obligations of the defendants to do so. See, e.g., Williams v. Office of Security & Intelligence, Inc., 509 So.2d 1282 (Fla. 3d DCA 1987), review denied, 518 So.2d 1277 (Fla. 1987); Johnson v. Thoni, 453 So.2d 188 (Fla. 3d DCA 1984); Lambert v. Doe, 453 So.2d 844 (Fla. 1st DCA 1984); Holley v. Mt. Zion Terrace Apartments, Inc., 382 So.2d 98 (Fla. 3d DCA 1980)(jury question on both issues); Cooper v. IBI Security Serv., 281 So.2d 524 (Fla. 3d DCA 1973), cert. denied, 287 So.2d 95 (Fla.1973). See generally Clay Electric Cooperative Inc. v. Johnson, 873 So.2d 1182 (Fla.2003); Restatement (Second) of Torts § 324A (1965).
As to this well-recognized, and entirely separate,[6] basis of liability, prior-offenses evidence is not necessary. This is simply because such a requirement is entirely superfluous to the fundamental basis of the underlying claim itself. It simply makes no sense that liability arising from what is essentially a breach of contract or voluntary undertaking would require a prior breach of the agreement to establish responsibility. Stating it a different way, since the very purpose of what the association and Centurion agreed to do was to exercise reasonable care to prevent any criminal incident from occurring, it cannot matter that the deadly incident in question was the first one. See Mata v. Mata, 105 Cal.App.4th 1121, 1129-30, 130 Cal. Rptr.2d 141, 145-46 (2003) ("Mata employed a security guard at El Rio Bar, and that guard was on duty the night of the shooting. The duty to protect had already been assumed and therefore the issue of foreseeability becomes irrelevant. . . . Under these circumstances, the injured patron need not prove the proprietor had notice of prior similar acts."); Trujillo v. G.A. Enterprises, Inc., 36 Cal. App.4th 1105, 1108, 43 Cal.Rptr.2d 36, 38 (1995)(relation between security guard and contracting business for security services sufficient to impose obligation to protect customers as would reasonable guard under similar circumstances); but cf. Delgado v. Trax Bar & Grill, 134 Cal.Rptr.2d 548 (2003)(holding contrary to Mata that no duty to prevent crime arises from mere fact that, unlike this case, bar owner voluntarily hired security guard without obligation to do so), review granted, 4 Cal. Rptr.3d 102, 75 P.3d 29 (2003); see also Paterson v. Deeb, 472 So.2d 1210, 1215 (Fla. 1st DCA 1985)("Because there are often additional considerations incident to the contractual and statutory obligations found in the usual landlord/tenant relationship, we do not perceive the foreseeability premise of the general rule governing landowner/invitee liability to be the exclusive basis for the landlord's liability to the tenant regarding criminal attacks committed on the leased premises."), review denied, 484 So.2d 8, 9 (Fla.1986).

IV.
Because we find that the defendants' other contentions are without merit, the judgments under review against both appellants are accordingly reversed with directions to enter judgments for the plaintiffs against both appellees on the *594 jury verdict.[7]
Reversed and remanded.
NOTES
[1] Of course, under Merrill Crossings Assocs. v. McDonald, 705 So.2d 560 (Fla.1997), the actual perpetrator of the crimes, Valle, cannot be considered a Fabre party.
[2] The trial judge stated:

I'm going to tell you . . . but for the case law which we've been talking about, I think [the Plaintiffs' evidence is] enough to have let the jury make the finding.
[3] We need and do not reach the correctness of this ruling.
[4] In the post trial order the trial judge, in accordance with his comments at the hearing, stated:

Because there was no record evidence of prior similar criminal conduct at the Lago Grande complex, the Lago Grande Homeowners Association, Inc., owed no duty to the plaintiffs to prevent the criminal acts committed by Frank Valle. Since Centurion Protective Services, Inc., was acting for the Association and fulfilling its non-delegable duty to provide security, it also owed no duty to the Plaintiffs and, therefore, is not liable to the Plaintiffs. [e.s.]
* * *
Without evidence of the predicate prior similar criminal acts, there is no duty owed by either the homeowners association or its agent-security company.
[5] For a possible explanation as to how this genuinely outstanding trial judge got so off the track as to reach a result based on what he himself correctly characterized as "awful," see Doctor v. State, 677 So.2d 1372 (Fla. 3d DCA 1996)(Schwartz, C.J., specially concurring), approved, 698 So.2d 1224 (Fla.1997).
[6] It is significant that Cooper, based on contractual duty, was decided seven years before Holley, the first Florida case to recognize a common law duty (based on notice of previous offenses) to protect against criminal activity.
[7] While the security company was the entity plainly guilty of "actual" negligence in fulfilling its contractual obligations and those of due care, the condominium association is properly held liable for those actions both (a) because of its own negligence in retaining Centurion after ample notice of its prior security deficiencies, see 2A Fla. Jur.2d Agency and Employment § 263 (1998), and (b) as vicariously responsible for Centurion's negligence because of its legal inability to delegate the non-delegable contractual duties it assumed in its agreements with its owner-members. See City of Coral Gables v. Prats, 502 So.2d 969 (Fla. 3d DCA 1987), and cases cited, review denied, 511 So.2d 297 (Fla. 1987); Mills v. Krauss, 114 So.2d 817 (Fla. 2d DCA 1959), cert. denied, 119 So.2d 293 (Fla. 1960).